Tony **CHRONOPOULOS**, Relator,

v.

**UNIVERSITY OF MINNESOTA,**
**Respondent.**

No. C1–94–647.

Court of Appeals of Minnesota.

Aug. 16, 1994.

Review Denied Oct. 27, 1994.

Stephen W. Cooper, Kathryn J. Cima, The Cooper Law Firm, for relator.

Mark R. Rotenberg, Gen. Counsel, Julie A. Sweitzer, Associate Gen. Counsel, Minneapolis, for respondent.

Considered and decided by PARKER, P.J., and RANDALL and SHORT, JJ.

## OPINION

PARKER, Judge.

The University of Minnesota denied tenure to Relator Anthony Chronopoulos. He appealed the administrative decision to the university's Senate Judicial Committee. The committee found no substantial need for a hearing and granted the university summary judgment. Chronopoulos obtained a writ of certiorari. On appeal, he argues that the decision to deny tenure violated university tenure rules and deprived him of his constitutional right to a hearing. We affirm.

## FACTS

The University of Minnesota (university) hired Anthony Chronopoulos in 1987. He served in a probationary tenure-track position as an assistant professor in the Department of Computer Science. The department experienced internal conflicts during Chronopoulos's appointment. A Computer Science review committee found, in April 1990, that a "political struggle" had existed since 1988. One member of the committee stated that the department was divided into two blocks, with Chronopoulos (and two professors who

have since resigned) aligned against six other professors. Chronopoulos and two professors within the department, Ravi Janardan and Haesun Park, were considered for tenure during the 1992–93 academic year.

Chronopoulos received annual performance appraisals throughout his six years as an assistant professor. Appraisals for the first two years described his reputation as a teacher as "not very good" and his research record as "modest." Later appraisals stated that his teaching had improved and that his publication record had "grown and strengthened." He was commended for his serious efforts and advised to put great emphasis on improving his teaching skills. Each annual evaluation recommended that Chronopoulos's probationary appointment be continued.

The computer science faculty considered Chronopoulos's candidacy for tenure in December, 1992. The faculty voted in favor of tenure by a vote of ten to three, with four abstentions. K.S.P. Kumar, head of the Computer Science Department, enthusiastically recommended that Chronopoulos be promoted and tenured. He also noted some faculty members' reservations, including ambivalence expressed in some letters of recommendation, a lack of federal grants, and average quality of research.

Chronopoulos's candidacy for tenure was then considered by the Institute of Technology's Promotion and Tenure Committee (P & T Committee). The P & T Committee recommended a denial of tenure, with four "no" votes and three "yes" votes. It sent an advisory recommendation to the dean of the Department of Computer Science, Gordon Beavers. Beavers sent Chronopoulos a letter agreeing to accept written comments regarding the P & T Committee findings. Chronopoulos responded with a written rebuttal to the P & T Committee's recommendation, claiming omissions, inaccuracies, and misrepresentations of his record, along with the claim that some of the department votes were politically motivated. On Beavers' request, the P & T Committee re-examined its findings in light of the new information provided by Chronopoulos and reaffirmed its earlier decision to deny tenure. Beavers then recommended to Ann Hopkins, vice

president of Arts, Science and Engineering, that Chronopoulos be denied tenure.

Hopkins reviewed Chronopoulos's file. In a letter to senior vice president and provost Ettore Infante, Hopkins stated that she "carefully reviewed the full augmented dossier" of Chronopoulos and found no evidence of political bias. She stated that his teaching and service were adequate, but that his research was questionable. Her letter to Infante recommended against tenure based on the failure to meet Institute of Technology tenure standards of "a record of excellence and creativity in scholarly research and its dissemination."

Infante independently reviewed the case. He compared Chronopoulos's file with those of Janardan and Park, who were granted tenure. Infante also telephoned two of Chronopoulos's references, one of whom expressed reservations about promoting him. Infante concluded that while Chronopoulos's teaching and research are adequate and have improved, they fail to meet the expected level of excellence required for tenure.

Chronopoulos appealed Infante's decision to the university's Senate Judicial Committee. He alleged that tenure was improperly denied due to gender discrimination, violations of his right to academic freedom, mistakes of fact, a lack of independent review, and a failure to apply required criteria. The Judicial Committee held a pretrial conference, at which time the university moved for summary judgment pursuant to committee rules. Each party submitted briefs. The panel found that the case did not merit further investigation and granted the university's request for summary judgment.

Chronopoulos appealed the Judicial Committee's decision to University president Nils Hasselmo. Hasselmo concurred with the panel's findings and dismissed Chronopoulos's complaint. Chronopoulos appeals, arguing that this denial of tenure is based on a violation of university tenure regulations and that it violates his due process and First Amendment rights to a hearing.

## ISSUES

I. Did the University of Minnesota arbitrarily deny Chronopoulos tenure by violating its internal grievance rules?

II. Did the University of Minnesota violate Chronopoulos's due process rights by granting summary judgment without affording him a testimonial hearing?

III. Did the University of Minnesota violate Chronopoulos's First Amendment rights by denying him a testimonial hearing?

## DISCUSSION

 Chronopoulos appeals to this court by writ of certiorari pursuant to Minn.Stat. §§ 606.01–.06 (1992). Review by certiorari is limited to an inspection of the record of the administrative tribunal, and this court is confined to questions affecting the regularity of the proceedings and, as to the merits of the controversy, whether the determination was arbitrary, oppressive, unreasonable, fraudulent, made under an erroneous theory of law, or without any evidence to support it. *Ganguli v. University of Minnesota*, 512 N.W.2d 918, 921 (Minn.App.1994) (citing *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn. 1992)). A reviewing court may reverse a university's decision to terminate an employee only if it finds a lack of substantial evidence to support that ruling. *Harford v. University of Minnesota*, 494 N.W.2d 903, 909 (Minn.App.1993), *pet. for rev. denied* (Minn. Mar. 30, 1993). Academic judgments are afforded great discretion, since decisions regarding a person's scholarship require expert evaluations that are not readily adapted to the procedural tools of judicial decision-making. *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978).

### I. *Violation of Tenure Code*

The University of Minnesota holds a constitutional grant of power. Minn. Const. art. XIII, § 3. Pursuant to this power, the Board of Regents enacted binding rules governing their internal grievance system. Univ. Charter, Laws 1851, Ch. 3, § 9. The university may not act beyond the scope of its power. *Regents of Univ. of Minn. v. Lord* 257 N.W.2d 796, 798 (Minn.1977). Chronopoulos argues that several violations of university tenure regulations render the denial of tenure arbitrary. The *Regulations Concerning Faculty Tenure* is a contract between the university and its faculty. Univ. Regs. § 2.1; *Ganguli,* 512 N.W.2d 921 (Minn.App.1994). It provides in relevant part:

7.7 *Improper Termination of Probationary Appointments.* A person holding a regular probationary appointment who has been given notice of termination may petition the Judicial Committee to review the action. The Judicial Committee will not base its ruling on the merits of the decision itself, but will review allegations that the decision was based in significant degree upon any of the following:

(a) Personal beliefs, expressions or conduct which fall within the liberties protected by law or by the principles of academic freedom as established by academic tradition and the Constitutions and laws of the United States and the State of Minnesota;

(d) Failure to consider data available at the time of decision bearing materially on the faculty member's performance.

Univ.Reg. § 7.7.

### A. *Failure to Consider Data*

 Chronopoulos argues that the university violated regulation 7.7(d) by neglecting to inspect a chart which he created that compares his credentials with those of two computer science professors who were granted tenure. The record does not suggest that the Judicial Committee reviewed the charts submitted by Chronopoulos. The P & T Committee, dean Beavers, and vice president and provost Infante did compare Chronopoulos's credentials with those of Park and Janardan. Infante, a mathematician, carefully compared each file and determined that Chronopoulos is not superior to Park or Janardan. The senate judicial panel reviewed each of these assessments and found no evidence that "clearly established" Chronopoulos as superior to either colleague in the areas of teaching, research, and service.

University tenure regulations require the Judicial Committee to review allegations that the decision to deny tenure was based in significant degree upon a failure to consider data material to Chronopoulos's performance. Univ. Reg. § 7.7(d). Although the actual comparative charts created by Chro-

nopoulos were apparently not reviewed, the panel considered comparisons between Chronopoulos and his colleagues conducted by qualified individuals. Because the panel reviewed the allegations and accepted qualified judgments that Chronopoulos's merit is not superior to that of his peers, regulation 7.7(d) is satisfied.

## B. *Political Considerations*

■ Chronopoulos also argues that the university violated regulation 7.7(a) by permitting political bias to infect the tenure decision process. The Judicial Committee panel reviewed this allegation and found no evidence of academic repression based on internal disputes within the Computer Science Department. Chronopoulos contends that he was denied tenure based on his association with a disfavored bloc of professors.

This assertion seems dubious in view of the fact that another purportedly "disfavored" professor, David Du, was granted tenure during the alleged political unrest. Moreover, ten computer science faculty members voted to award Chronopoulos tenure and only three voted against tenure. The head of the Computer Science Department sent a favorable letter to dean Beavers "enthusiastically recommending" that Chronopoulos be granted tenure. The ten affirmative votes and a positive endorsement by the dean of the Computer Science Department negate the allegation of bias.

The decision to deny tenure was ultimately made by provost Infante. There is neither evidence nor allegation that Infante was influenced by bias within the Computer Science Department. In fact, the record indicates that Infante, while acting head of the Institute of Technology, attempted to resolve any unrest within the department and bring political disputes to a collegial disposition. The panel found that the claim of political bias was thoroughly and carefully considered, and no significant evidence suggested that Beavers, Hopkins, or Infante were biased or unduly influenced by alleged bias within the department. Substantial evidence supports this finding. The university complied with regulation 7.7(a).

## C. *Compliance with Discovery Requests*

Chronopoulos argues that the university failed to comply with discovery requests by neglecting to produce requested documents and by failing to produce witnesses. University discovery rules provide:

> The respondent and the University administration should make available to the complainant whatever authority they possess under law to compel the production of documentary evidence and to procure the cooperation of persons in supplying information.

Univ. Rule 12(a). Review of Chronopoulos's discovery requests suggests the university may have been untimely in producing some documents. Other documents were withheld or redacted because they are protected by the Minnesota Data Practices Act. Minn. Stat. §§ 13.01–.99 (1992). Private data protected under the Data Practices Act was provided to Chronopoulos in summary form. The university maintained that it could not be required to produce potential witnesses to appear in an evidentiary hearing, and that witnesses must voluntarily agree to be interviewed. This is correct, since the university lacks subpoena power. Chronopoulos failed specifically to identify any document or information not provided, nor does he specify how the university failed otherwise to cooperate in producing documents or witnesses. Examination of the record leads us to conclude that there was no violation of discovery process provided by Univ. Rule 12(a).

## D. *Substantive Reasons for Denial*

■ Chronopoulos argues that the university failed to provide substantive reasons for denying tenure. University regulations provide in relevant part:

> The academic unit must * * * report the vote of the faculty, together with the reasons for the actions taken.

Univ.Reg. § 7.4(5).

> The University may not act contrary to the recommendation of the academic unit which made the initial recommendation except for substantive reasons which must be stated in writing by the Vice President

* * * to the faculty member, to the members of the academic unit which made the recommendation, and to the President.

Univ.Reg. § 7.63.

Chronopoulos contends that the P & T Committee's failure to provide substantive reasons violated Univ.Reg. §§ 7.4(5) and 7.63. The P & T Committee did not provide substantive reasons, only a brief summary of its recommendation. The Judicial Committee panel found it "surprising" that the P & T Committee was not more explicit in its summary, but determined that substantive reasons need only be provided by the vice president (Infante). This is a valid interpretation of the regulations, since sections 7.4(5) and 7.63, when read together, refer to "academic unit" as the unit which "made the initial recommendation," in this case the Computer Science Department. Section 7.63 requires the vice president, not the academic unit, to provide substantive reasons for a decision to deny tenure. Thus, the P & T Committee is merely advisory and is not required to give detailed substantive reasons to the extent required of the vice president.

■ Chronopoulos also argues that vice president Infante failed to provide substantive reasons for denying tenure. Nowhere do the university's regulations define the term "substantive." In *Ganguli*, the court expressed "grave doubts" whether regulation 7.63 was satisfied when Infante sent a brief letter, which read:

I was not convinced * * * that your scholarship achieved the threshold of quantity or quality that I find acceptable for the awarding of indefinite tenure. Nor was the teaching record so exemplary as to compensate for limitations in the record of scholarship.

*Ganguli*, 512 N.W.2d at 922. By contrast, a portion of Infante's letter to Chronopoulos reads:

* * * While your teaching performance has improved during the probationary period, it still appears to only approach the mean score for the department on student ratings; * * * [t]he number of students graduated and currently in progress with you as an advisor is modest, especially for a graduate program with as many students as Computer Science. There are 16 articles published in refereed journals; two of these are in journals that represent the highest tier outlets in this field; recent competitive grant funding from federal sources has been minimal although some proposals are now out for consideration. External reviewers have made positive comments about your research and scholarly activities but three of the writers express reservations. These evaluators * * * stop short of strongly endorsing your contributions to your field of research.

We believe that *Ganguli* is distinguishable from the present case insofar as Infante's letter to Ganguli lacked sufficient substantive reasons for denying tenure; that letter was conclusory and legally insufficient. Infante's letter to Chronopoulos, on the other hand, specifically sets forth substantive reasons describing the bases for his decision to deny tenure. This complies with the requirements of Univ.Reg. § 7.63. The university did not arbitrarily or capriciously deny tenure based on rule violations.

## II. *Right to a Hearing*

### A. *Procedural Due Process*

■ Chronopoulos asserts a due process right to a hearing. Generally, in a termination proceeding against a *tenured* faculty member, due process requires:

(1) clear and actual notice of the reasons for termination in sufficient detail to enable him or her to present evidence relating to them;

(2) notice of both the names of those who have made allegations against the teacher and the specific nature and factual basis for the charges;

(3) a reasonable time and opportunity to present testimony in his or her own defense; and

(4) a hearing before an impartial board or tribunal.

*Harford*, 494 N.W.2d at 909 (citing *King v. University of Minn.*, 774 F.2d 224, 228 (8th Cir.1985)). A tenure candidate, however, must be deprived of a liberty or property interest before a full hearing is required.

*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). There is no liberty interest in being rehired into a tenured position. *Id.* at 575, 92 S.Ct. at 2708. A property interest in achieving tenure exists only if the candidate has a "claim of legitimate entitlement" to tenure. *Id.* at 577, 92 S.Ct. at 2709.

■ Chronopoulos's contract with the university provides that non-tenured professors hold probationary appointments and become candidates for tenure. Univ.Reg. § 6.1. Neither Minnesota statutes nor State College Board regulations entitle non-tenured faculty to a hearing as a matter of law. *Setty v. Minnesota State College Board,* 305 Minn. 495, 497, 235 N.W.2d 594, 595 (Minn. 1975), *pet. for rev. denied* (Minn. Dec. 16, 1975). Chronopoulos argues that by acting in conformity with university tenure guidelines, he justifiably expected to be tenured. Non-tenured faculty may, under limited circumstances, be deemed to have a property interest in receiving tenure under an implied contract theory when no tenure system exists, but tenure is routinely granted as a matter of practice. *Perry v. Sindermann,* 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). No evidence indicates the university engages in such a practice. As a non-tenured faculty member, Chronopoulos is not entitled to a full testimonial hearing on the merits to satisfy due process.

■ We believe that Chronopoulos's due process rights were preserved by compliance with the university's grievance procedures, which provide sufficient evidentiary review. We note at the outset that the basic procedures followed in the university's internal grievance process have been upheld as affording due process. *Harford,* 494 N.W.2d 903, 909; (citing *Mueller v. Regents of Univ. of Minn.,* 855 F.2d 555, 560 (8th Cir.1988); *Agarwal v. Regents of Univ. of Minn.,* 788 F.2d 504, 508 (8th Cir.1986)).

Chronopoulos was afforded extensive evidentiary review. He received annual performance appraisals. His candidacy for tenure was reviewed and submitted to a majority vote by the computer science faculty. The P & T Committee voted, summarized the tally of the final votes, and sent its advisory recommendation to the head of the department. Chronopoulos was provided with copies of each recommendation. He submitted documentary evidence and written rebuttals. The vice president of Arts, Science and Engineering reviewed each of his allegations. Vice president and provost Infante made independent findings and conclusions regarding merit. Chronopoulos received timely notice and substantive reasons explaining why tenure was denied. He then appealed to the Senate Judicial Committee, which further reviewed his credentials and each contention of impropriety. The committee issued detailed substantive findings and conclusions. Finally, written comments were sent by Chronopoulos to president Hasselmo, who then made the ultimate decision denying tenure.

After review of the record, we believe that the university complied with its tenure code, and that Chronopoulos received sufficient due process. Documentary submissions in university grievance procedures provide adequate evidentiary bases under which an informed decision can be made. This obviates the necessity for a testimonial hearing, and comports with due process requirements.

### B. *Summary Judgment*

Chronopoulos also argues that the university's grant of summary judgment denied him due process. He claims that material issues of disputed fact should preclude summary judgment. Senate Judicial Committee rules provide:

> On the motion for summary judgment, the issue for the panel is whether there is a substantial need for a hearing. If the case can be fairly decided on the basis of the materials submitted in conjunction with the motion for summary judgment, then the Panel may issue its findings and recommendations without holding a hearing.

Univ.Rule 14(c). The Judicial Committee found no "substantial need" for a hearing and granted the university summary judgment.

■ The university's tenure proceedings are quasi-judicial. *Harford,* 494 N.W.2d at 906. Administrative agencies acting quasi-

judicially in termination proceedings are not held to the same strict procedural rules required in courts of law. *Holton v. Board of Educ. of Indep. Sch. Dist. No. 84*, 301 Minn. 275, 282, 222 N.W.2d 277, 282 (1974); *Morey v. School Bd. of Indep. Sch. Dist. 492*, 271 Minn. 445, 448–49, 136 N.W.2d 105, 107–8 (1965), *pet. for rev. denied* (July 13, 1965). This stems from the notion that quasi-judicial decisions, particularly with regard to academic scholarship, require specialized expertise. The comment to university rule 14(c) states that its summary judgment standard is intentionally more lenient than that established by the Minnesota or Federal Rules of Civil Procedure. The university may grant summary judgment if "facts adduced in the summary judgment materials clearly demonstrate that the non-moving party has no substantial chance of establishing the claim." Summary judgment may be granted "even if the Panel has to resolve issues of material fact in order to grant the motion." Comment, Univ. Rule 14(c).

In *Ganguli*, the court determined that material factual issues precluded summary judgment, 512 N.W.2d at 922. We find *Ganguli*, described by that court as "riddled with error," distinguishable from the present matter. *Id.* at 923. As previously discussed, there were "grave doubts" whether Infante provided Ganguli with substantive reasons for denying tenure. *Id.* at 922. Neither the panel nor the full Judicial Committee issued any findings of fact on Ganguli's complaint. *Id.* There was a dispute whether Infante properly considered all votes, recommendations, and reports with respect to Ganguli's claim, and whether bias existed. *Id.* Furthermore, the committee panel in *Ganguli* was found to have "prejudged" the Judicial Committee by consulting with it prior to issuing a decision. *Id.* at 923.

None of the errors present in *Ganguli* are shown to have occurred in this case. Chronopoulos was given substantive reasons for his tenure denial. Findings of fact and conclusions were issued after a thorough review of his case. There is no evidence that bias or other improper conduct in the grievance process played a substantial role in Chronopoulos's case. In *Ganguli*, reasons for denying tenure were inadequate as a matter of law; no such legal conclusion can be reached in the present case. To the extent that dictum in *Ganguli* impliedly endorses the civil procedure summary judgment standard, we are unpersuaded that the less restrictive approach established by the university is fundamentally unfair.

Chronopoulos cites several fact issues requiring a hearing including: whether he is more qualified than Janardan and Park; whether the reasons provided for denying tenure were unpersuasive; if differential standards and improper criteria were used to deny tenure; whether personal or political bias infected the decision; if key information was omitted; and, whether tenure procedures were violated when Infante contacted outside reviewers by telephone. As discussed above, each of these allegations was considered and discounted during an exhaustive review of evidentiary materials which began shortly after the panel was appointed. Chronopoulos's final concern, regarding the propriety of Infante's contact with outside reviewers, seems ironic because his attorney commended Infante contemporaneously for making the contacts.

Whether a decision-making official should personally contact outside reviewers is open to question. In this case, the content of Infante's contacts was preserved on the record and made available to each party. Evidence supports the committee's determination that Chronopoulos's case was not prejudiced by Infante's actions.

The judicial committee reviewed the evidence in the light of Chronopoulos's allegations and determined that the matter could be fairly decided based on written materials submitted by each party. This finding is substantially supported by the record. We hold that the university's summary judgment standard afforded Chronopoulos due process, and Chronopoulos has demonstrated no substantial need for a hearing in this case.

### C. *Substantive Due Process*

In order to prove a violation of substantive due process, Chronopoulos must demonstrate that the university acted arbitrarily in dismissing him, or that the dismiss-

al was "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ross v. Univ. of Minn.,* 439 N.W.2d 28, 34 (1989) (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985)). A reviewing court will not conduct a *de novo* review of the university's termination decisions; rather, the court may reverse the agency's decision only if it finds a lack of substantial evidence to support that ruling. *Harford,* 494 N.W.2d at 909. As discussed above, substantial evidence supports the university's decision not to renew Chronopoulos's appointment. A thorough and exhaustive review was conducted by well-qualified educators who determined that while Chronopoulos may have been a good teacher, his qualifications did not meet the level of excellence established by the university as a prerequisite to tenure.

In essence, Chronopoulos's due process arguments are founded on the assertion that the university violated its own rules. The university's internal grievance rules have been held to comport with due process, and the rules have been followed in the present case. Judicial intrusion into academic decision making is improper, *Horowitz,* 435 U.S. at 92, 98 S.Ct. at 956, and we decline to do so in this case. We hold that the university's decision to deny tenure to Chronopoulos was not arbitrary or capricious, and that the decision is supported by substantial evidence.

D. *First Amendment*

Chronopoulos argues that he is entitled to a hearing based on a First Amendment claim. Despite having no property interest in tenured employment, due process may require a hearing if a constitutionally protected freedom of speech claim exists. *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697. A hearing is required where the contract non-renewal is related to the teacher's exercise of free speech under the First Amendment. *Setty,* 305 Minn. at 498, 235 N.W.2d at 596. Chronopoulos asserts that his personal association with "disfavored" faculty members and resulting political bias establishes a First Amendment claim.

Again, the computer science faculty voted in favor of granting him tenure, and there is no evidence suggesting that the ultimate decision-makers were influenced by personal or political factors. Because allegations of First Amendment infringements were carefully reviewed and determined to be without merit, a hearing is not required by this claim.

### DECISION

The University of Minnesota complied with its tenure rules when it denied tenure to Anthony Chronopoulos. The decision comported with due process and First Amendment requirements, and was not arbitrary or capricious.

**Affirmed.**