John SENIOR, Jr., Relator,

v.

CITY OF EDINA, Respondent.

No. C9–95–2009.

Court of Appeals of Minnesota.

May 7, 1996.

David D. Himlie, Dederick & Himlie, P.A., Edina, for relator.

David J. Lauth, Dorsey & Whitney P.L.L.P., Minneapolis, for respondent.

Considered and decided by PARKER, P.J., and SCHUMACHER and MANSUR, JJ.

## OPINION

MARTIN J. MANSUR, Judge.*

Respondent city terminated relator's position as a firefighter for his long-standing failure to address concerns about his size and weight. Relator challenges the city council's decision to uphold his termination, arguing that it was arbitrary and capricious. We affirm.

## FACTS

Relator John Senior, Jr., became a firefighter with respondent City of Edina (the city) in 1980.[1] In 1984, Senior injured his thumb in a work-related incident that prevented him from working for some time. A doctor authorized his return to full duty in 1987, but the Edina Fire Chief (the chief) would not approve such a return without a full medical evaluation. Without ever re-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment to Minn. Const. art. VI, § 10.

1. Although the position is called "volunteer firefighter," it is actually a part-time, paid position.

turning to duty, Senior requested and was granted a personal leave of absence from October 1, 1987, to December 31, 1987. The chief also granted Senior a subsequent request for an extension of the leave through April 1, 1988.

Senior attempted to return to duty following this leave of absence. However, in May 1988, when trying on a self-contained breathing apparatus (SCBA), an essential piece of equipment used by firefighters, his great size and weight prevented him from fastening the belly strap of the harness. He also stated that he had difficulty climbing a ladder while wearing his standard firefighting apparel. Senior's weight was approximately 307 pounds at this time. An examining doctor noted that this was "quite a bit overweight," and indicated that Senior's best weight would be around 225 pounds.

The chief told Senior that he would not be permitted to return to duty until he lost sufficient weight to fit into the city's standard equipment. In January 1989, the chief again advised Senior that he needed to lose weight and set up a schedule for Senior to meet weekly with an assistant fire chief to check his progress. The chief set May 1, 1989, as the target date for Senior's return.

The city was prepared to allow Senior to return to duty in June 1989 and purchased new, larger-sized gear for him. This specially-ordered equipment was not expected to arrive for approximately six months. In March 1990, another finger injury prevented Senior from returning to work as a firefighter. He received extensions of his leave for that injury in May and June. In July 1990, the chief informed Senior that his performance was unsatisfactory because of his failure both to participate in enough training and to respond to enough fire calls.[2]

In April 1991, Senior met with the chief and an assistant chief to discuss his weight and its effect on his ability to safely perform the job. A follow-up letter in July reiterated the city's concerns that Senior was not making any progress at losing weight.

On August 1, 1991, another meeting was held at which Senior was directed to reduce his weight by November 1 and to contact the chief by November 15 to discuss his progress. On November 6, an assistant chief wrote to remind Senior of his obligations. On February 24, 1992, Senior met with the chief and an assistant. By that time, Senior had gained even more weight, such that the new, specially ordered larger gear did not fit him. The chief placed Senior on suspension due to his continued failure to reduce his size and weight to a level that would allow him to fit into his gear and to safely perform his duties.

In March 1992, the chief wrote to the Edina City Manager (city manager) recommending Senior's termination. The chief noted that Senior had not performed any firefighting duties since 1984, and discussed the safety and health risks posed by Senior's weight. These included concerns about flexibility, agility, heat exhaustion, and cardiovascular conditioning. Several attachments to the chief's letter from published firefighting manuals and guides described the physical demands of the job and the related dangers posed by obesity.

Despite this recommendation, the city manager did not yet terminate Senior's position. A letter from the city manager dated May 7, 1992, again gave Senior the opportunity to address the weight issue, setting a time limit of six months in which to make reasonable progress. Senior failed to set up the required check-up appointments. On May 27, an assistant chief wrote again, repeating the city's expectations and instructing Senior to contact the fire department within two weeks to discuss the situation.

Senior met with an assistant chief on June 15, 1992, but had failed even to begin to address the weight issue. In November, the chief again recommended to the city manager that Senior be dismissed.

The city manager conducted a hearing with Senior on January 20, 1993. He then terminated Senior's employment by letter dated January 26, noting that the work requires "a high degree of flexibility and en-

2. It appears that at this time, Senior was technically on duty to some degree with the fire department. However, there is no clear evidence that he actually fought any fires.

durance" and that the dismissal was necessary for "[t]he safety and protection of our citizens, your fellow firefighters, and you." The city manager indicated that Senior would be considered for rehire if he: (1) reduced his size to enable him to fit into his gear and reduced his weight to 240 pounds; and (2) completed the new recruit testing, including written, oral, psychological, and physical agility tests. The city manager denied Senior's request for reconsideration of the decision.

Following this decision, Senior purchased, at his own expense, new firefighting gear that would fit him. He was told by the city manager's office, though, that this action was not sufficient to alleviate the city's concerns. Senior was informed that the city's policy is to use standard equipment. One reason for the policy is that some of the equipment is stored directly on the firefighting vehicles and has to be accessible and safe for all firefighters. The larger SCBA harness that Senior purchased presented concerns that dangerous loose ends would dangle if the harness were to be used by others. Senior was also informed that some of the equipment he purchased was made of unsafe and unacceptable material.

At Senior's request, the city manager conducted two evidentiary hearings. Senior was represented by counsel. At the first hearing, in October 1993, Senior estimated his weight at 350 pounds and acknowledged that he weighed as much as 400 pounds within the past year. This represented an *increase* from his weight of 307 pounds at the time the city first addressed the issue with him in 1988.

An assistant fire chief testified about the dangers of other firefighters' use of oversized SCBA harnesses. Senior produced his new equipment, including an item he described as an "extending belt" which would connect to and allow him to use a standard-size SCBA harness, but which could be removed quickly when he was not using the harness. He further testified that he had recently passed a physical agility test and a physical exam by a "dive doctor" with the Hennepin County Sheriff's Department dive team.

After the hearing, it became apparent that the "extending belt" was simply a strap from a medical cot that Senior had taken from the Edina Fire Department, and not what he had described. Further, it was learned that he had not been examined by a dive doctor.

At the next hearing, on November 10, 1994, Senior explained that he had meant only to testify that he was planning on being examined by a dive doctor. He testified that he did not know his precise weight, but that within the last few months it had been 350 pounds.

The city manager stated that he was not going to change his original decision to terminate Senior's employment. He repeated the conditions for rehire. Senior appealed to the Edina City Council (the council). After a hearing in April, the council voted at its June 5, 1995, meeting to uphold Senior's termination. The council concluded that the decision had been based on "legitimate concerns regarding the health and well being of Senior, the City's other firefighters, and the City's residents." The council noted that Senior had been inactive as a firefighter for more than 10 years and had failed to address the city's concerns about his weight for seven years.

The council adopted proposed findings and conclusions at the June 5, 1995, meeting. Senior's attorney was served by mail with a written copy on July 21, 1995. On September 19, 1995, Senior petitioned for and obtained a writ of certiorari in this court.

## ISSUES

1. Was Senior's petition for writ of certiorari timely under Minn.Stat. § 606.01 (1994)?

2. Was the city's decision to terminate Senior's employment arbitrary and capricious?

## ANALYSIS

### 1. Timeliness of Petition for Writ of Certiorari

■ Under Minn.Stat. § 606.01 (1994), [n]o writ of certiorari shall be issued, to correct any proceedings, unless such writ shall be issued within 60 days after the

party applying for such writ shall have received due notice of the proceeding sought to be reviewed thereby.

There is no dispute that Senior and his attorney were present on June 5, 1995, when the council approved the city's proposed findings and conclusions in this case. The city argues that this constituted actual notice of the decision on that date, satisfying the "due notice" requirement in Minn.Stat. § 606.01 (1994). The city thus contends that the 60-day time limit in the statute had run before September 19, 1995, when the writ was issued.

Senior contends that the "due notice" requirement was not satisfied until his attorney received written notice of the council's findings and conclusions on July 21, 1995. We agree.

The "due notice" requirement related to time limits on the issuance of a writ of certiorari was discussed in *In re Judicial Ditch No. 2, Houston County,* 163 Minn. 383, 202 N.W. 52 (1925), where the supreme court stated:

> [T]he time within which the writ may be issued does not begin to run until written notice of the order or other proceeding to be reviewed has been served upon the party adversely affected or his attorney, and * * * actual notice does not take the place of such written notice.

*Id.* at 384, 202 N.W. at 53.

In *State ex rel. Kruse v. Webster,* 231 Minn. 309, 43 N.W.2d 116 (1950), the supreme court again considered the "due notice" issue, in the context of a police civil service commission's appointment of a police chief. *Id.* at 310–11, 43 N.W.2d at 118. The commission failed to provide each applicant with a written report, in violation of its own rules. *Id.* at 311, 43 N.W.2d at 118. The court relied on *Judicial Ditch No. 2* in holding that in the context of a civil service examination, the limitations period under Minn.Stat. § 606.01 will not begin to run until written notice of the results of the exam are served upon the aggrieved party. *Webster,* 231 Minn. at 312–14, 43 N.W.2d at 118–19.

The city urges that under *Bahr v. City of Litchfield,* 420 N.W.2d 604 (Minn.1988), *Webster* has been overruled and Senior's actual notice was sufficient to start the limitations period. In *Bahr,* the supreme court was again faced with a police civil service commission's failure to inform candidates in writing of the appointments made. *Id.* at 605. The aggrieved candidates did have actual notice of the decision, having seen a posting of it in the department office, where they were told it would be. *Id.* They petitioned for a writ of certiorari for review of the decision well over 60 days after having seen the posting. *Id.* at 605–06.

The *Bahr* court reconsidered *Webster,* distinguishing it on the basis that the police commission there had not followed its own rules requiring written notice. *Bahr,* 420 N.W.2d at 607. The court went on to conclude that this failure would have been sufficient to find that the "due notice" requirement had not been satisfied, stating:

> We now conclude that [the] extension of the holding of *Judicial Ditch No. 2* was not only unnecessary to the decision in *Webster,* but also overbroad. Therefore, to the extent that *Webster* is inconsistent with our decision today, it is overruled.

*Bahr,* 420 N.W.2d at 607.

The court then discussed the requirement of "due notice" contained in Minn.Stat. § 606.01. *Bahr,* 420 N.W.2d at 607. It stated:

> We believe that the phrase "due notice" should properly be defined in the context in which the notice requirement is imposed. * * * "Due notice" of a decision or order rendered in such quasi-judicial proceedings as a contested case conducted according to the Administrative Procedure Act or a workers' compensation case conducted pursuant to chapter 176 is that prescribed by statute. On the other hand, if the decision is made in a nonjudicial proceeding such as that presented here, where the participants entered the proceeding by applying as candidates for promotion, the commission must follow its own

rules for notifying candidates of the decision.

*Id.* (footnote omitted).

The proceedings here are clearly quasi-judicial, involving testimonial and documentary evidence. The Edina City Code, ch. 150.20, subd. 5, requires that

[t]he findings and conclusions of the Council on an appeal shall be in writing, filed with the Clerk, and served upon the employee and the [City] Manager.

This provision is analogous to the statutory provisions discussed in *Bahr* as controlling the issue of when the limitations period begins, and thus indicates that "due notice" exists only upon service of written findings and conclusions. Senior did not have "due notice" until his attorney received such service on July 21, 1995. The writ of certiorari, filed on September 19, 1995, was therefore timely under the 60–day limit contained in Minn.Stat. § 606.01 (1994).

### 2. Reasonableness of Decision to Terminate

■ Review by writ of certiorari is limited to an inspection of the record of the inferior tribunal and

"is necessarily confined to questions affecting the jurisdiction of the board, the regularity of its proceedings, and, as to merits of the controversy, whether the order or determination in a particular case was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it."

*Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn.1992) (quoting *State ex rel. Ging v. Board of Educ.*, 213 Minn. 550, 571, 7 N.W.2d 544, 556 (1942) (overruled on other grounds)). The reviewing court is not to retry the facts or make credibility determinations. *Dokmo v. Independent Sch. Dist. No. 11*, 459 N.W.2d 671, 674–75 (Minn.1990). The decision is to be upheld if the lower tribunal "furnished any legal and substantial basis for the action taken." *Beck v. Council of St. Paul*, 235 Minn. 56, 58, 50 N.W.2d 81, 82 (1951) (footnote omitted).

■ The record here more than adequately supports the council's decision to termi-

nate Senior's employment. Evidence in the record establishes that a high level of physical fitness is required to work safely as a firefighter. The safety concerns relate not only to the individual firefighter, but also to other firefighters and to the citizens they protect. Flexibility, agility, and high cardiovascular functioning are all crucial to the job.

Senior overemphasizes the city's reliance on the equipment problem. Even assuming that his equipment itself meets safety standards and poses no risk when used by others, the equipment concern was not the cause of the city's decision, but rather a consequence of his weight problem.

The record demonstrates numerous patient attempts by the city, over a seven-year period, to gain Senior's cooperation in reducing his weight. He has failed to demonstrate any progress towards that goal.

Senior asserts that the city has not demonstrated any connection between his weight and an inability to perform his duties. He argues that the goal weights set by the city are arbitrary. We disagree.

The chief's termination recommendation to the city manager included evidence that obesity substantially affects areas of functioning that are crucial to firefighters. A physician's report from 1988 indicated that at 307 pounds, Senior was "quite a bit overweight," and recommended a goal weight of 225 pounds. The city has set a 240–pound limit as a condition for rehiring, thus demonstrating even more leniency. Senior has never even approached these weights, testifying himself to weights of around 350 pounds and more in the last few years. Even absent precise data defining the connection between Senior's degree of obesity and poor firefighting ability, we believe that the council acted properly in determining that Senior is not capable of performing the job safely at the weights he has been at throughout this controversy.

■ Senior's complaint that the city is imposing a new testing requirement on him is without merit. The testing outlined by the city is a condition he must meet should he want to be considered for rehire, and is irrelevant here. Senior was terminated not

for failing to take or pass any tests, but rather because his weight makes it unsafe for him to work as a firefighter and because he has failed to cooperate with the city in its extremely patient attempts to help him reduce his weight.

## DECISION

Senior's petition for writ of certiorari, seeking review of the city's termination decision, was timely. Nevertheless, the decision was not arbitrary or capricious because it was based on legitimate safety concerns posed by Senior's weight problem and his refusal to cooperate with the city in its numerous and patient attempts to address that problem. The city properly affirmed the city manager's decision to terminate his position.

**Affirmed.**