*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1567**

Daniel Gruenstein,
Relator,

vs.

Regents of the University of Minnesota,
Respondent.

**Filed June 13, 2016
Affirmed
Hooten, Judge**

University of Minnesota

Darren M. Sharp, Schaefer Halleen, LLC, Minneapolis, Minnesota (for relator)

William P. Donohue, General Counsel, Brent P. Benrud, Senior Associate General Counsel, University of Minnesota, Minneapolis, Minnesota (for respondent)

Considered and decided by Hooten, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

Relator seeks review by writ of certiorari of respondent university's nonrenewal of his appointment as a clinical scholar faculty member, arguing that his nonrenewal violated four university policies. We affirm.

**FACTS**

In July 2006, relator Dr. Daniel Gruenstein was appointed as a non-tenured clinical scholar faculty member at respondent University of Minnesota (university). Dr. Gruenstein's appointment was governed by an annually renewable contract. He initially worked as an assistant professor in the cardiology division of the pediatrics department, but was appointed as an associate professor on May 13, 2013. Like many other members of the medical school faculty, Dr. Gruenstein had a separate employment-at-will relationship with University of Minnesota Physicians (UMP), a private practice group comprised primarily of members of the medical school faculty.

In March 2014, the head of the pediatrics department (department head), who was also the manager of the pediatrics clinical service unit at UMP, met with Dr. Gruenstein and advised him that his employment with UMP was being terminated and that his appointment at the university was not being renewed. In explaining the reasons for the termination and the nonrenewal, the department head told Dr. Gruenstein that these actions were not being taken because of any performance concerns, but because UMP and the university "were moving in a different direction." Following the meeting, UMP sent Dr. Gruenstein a letter, dated March 13, 2014, stating that his employment with UMP was being terminated. Dr. Gruenstein received a separate letter from the university, dated March 13, 2014, stating that his appointment with the university was not being renewed. Dr. Gruenstein requested that the department head provide him with a letter that stated that the university's decision not to renew his appointment was not taken for performance reasons, which the department head provided on March 27, 2014.

On July 8, 2014, Dr. Gruenstein challenged the university's nonrenewal decision by filing a grievance petition with the university's conflict resolution office. In his petition, Dr. Gruenstein alleged that the nonrenewal decision violated the following four university policies: (1) Board of Regents Policy—Employee Performance Evaluation and Development; (2) Administrative Policy—Reporting and Addressing Concerns of Misconduct; (3) Board of Regents Policy—Employee Recruitment and Retention; and (4) Board of Regents Policy—Equity, Diversity, Equal Opportunity, and Affirmative Action. Dr. Gruenstein also claimed that the director of the pediatric department's cardiology division (director), who was also employed by UMP, tortiously interfered with his employment contract and his academic promotion at the university. A hearing was scheduled before a panel consisting of three members of the university faculty appointed under provisions of the university's conflict resolution policies. Prior to the hearing, it was determined that the panel had no jurisdiction to address any claims Dr. Gruenstein had against UMP and that the only issue to be addressed by the panel was whether there were violations of the university's policies with regard to the nonrenewal of the university's contract with Dr. Gruenstein.

At the hearing, Dr. Gruenstein testified that he began to experience conflict with the director in 2011 or 2012 after expressing interest in pursuing a leadership role within the pediatrics department at the university. Dr. Gruenstein alleged that the director began actively interfering with his employment at both UMP and the university at this time by diverting patients away from him, removing him from his position as the doctor in charge of the catherization lab, withdrawing support at the last minute for his application for a

3

promotion at the university, and failing to objectively evaluate his performance in March 2013. Dr. Gruenstein stated that he complained to the department head about the director's sudden withdrawal of support for his promotion and reported to the department head his concerns about the director's failure to objectively evaluate him to the department head. Dr. Gruenstein testified that when he was informed by the department head that his employment with UMP and his appointment with the university were ending, there was no distinction made between UMP and the university.

The department head testified that, as the supervisor of the director and Dr. Gruenstein both at UMP and the university, he was the one who decided to terminate Dr. Gruenstein from UMP and not renew his appointment with the university. The department head testified that he did not consult with the director when making the nonrenewal decision. The department head explained that, in anticipation of the impending retirement of the director and his assessment that Dr. Gruenstein was not seen as a prospective leader of the pediatric cardiology program going forward, it was not economically feasible to continue Dr. Gruenstein's employment with UMP or his association with the university. The department head also explained that the nonrenewal of Dr. Gruenstein's appointment with the university would naturally follow his termination from UMP because as a clinical scholar, he was hired predominately to do clinical work, which would occur at UMP. The department head stated that because a sizable part of a clinical scholar's salary is earned through his practice of medicine at a clinic, it would not be practical for the university to continue to associate with a clinical scholar who had been terminated from UMP. The department head admitted, however, that there are physicians employed at UMP who are

4

not associated with the university and that there are physicians associated with the university who are not employed by UMP.

At the hearing, the university submitted little to no evidence contradicting Dr. Gruenstein's allegations of misconduct by the director. Instead, the university argued that any misconduct by the director was not connected with the nonrenewal of Dr. Gruenstein's university appointment.

On May 15, 2015, the panel issued its report. The panel determined that the university did not violate the Employee Recruitment and Retention policy or the Equity, Diversity, Equal Opportunity, and Affirmative Action policy, but concluded that the university violated the Employee Performance Evaluation and Development policy and the Reporting and Addressing Concerns of Misconduct policy. The panel also determined that the director had tortiously interfered with Dr. Gruenstein's appointment.

Pursuant to university policy, the panel's report was sent to the university provost for a final decision. The provost accepted the panel's findings that Dr. Gruenstein's nonrenewal did not violate the Equity, Diversity, Equal Opportunity, and Affirmative Action policy or the Employee Recruitment and Retention policy. However, the provost rejected the panel's findings as to the other two policies and the tortious interference claim and affirmed the nonrenewal of Dr. Gruenstein's university appointment. Dr. Gruenstein petitioned this court for a writ of certiorari, which this court issued.

**D E C I S I O N**

5

In the absence of a statutory right to review, the issuance of a writ of certiorari pursuant to Minn. Stat. § 606.01 (2014) is the exclusive method available for judicial review of quasi-judicial decisions of administrative bodies. *Williams v. Smith*, 820 N.W.2d 807, 813 (Minn. 2012); *Brenny v. Bd. of Regents*, 813 N.W.2d 417, 420–21 (Minn. App. 2012). Because the university, as a legal entity with "autonomous status as a constitutional corporation," is part of the executive branch of state government, "courts of this state must accord the university substantial deference" under the principle of separation of powers. *Brenny*, 813 N.W.2d at 420–21 (quotations omitted); *see Dokmo v. Indep. Sch. Dist. No. 11*, 459 N.W.2d 671, 674 (Minn. 1990) (recognizing that separation-of-powers principle applies to review of decisions of school districts).

Our review of the university's quasi-judicial decision "is limited to an inspection of the record developed by the university in reaching its decision." *Stephens v. Bd. of Regents*, 614 N.W.2d 764, 769 (Minn. App. 2000), *review denied* (Minn. Sept. 26, 2000). We review the record to determine if the university's decision was "arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it." *Id.* (quotation omitted). This court may reverse a university's employment decision "only if it finds a lack of substantial evidence to support that ruling." *Chronopoulos v. Univ. of Minn.*, 520 N.W.2d 437, 441 (Minn. App. 1994), *review denied* (Minn. Oct. 27, 1994). When reviewing a case by writ of certiorari, this court may not retry facts or make credibility determinations. *Senior v. City of Edina*, 547 N.W.2d 411, 416 (Minn. App. 1996). "The standard for assessing conflicting evidence" in quasi-judicial cases is "not to weigh the evidence, but to review the record to determine whether there

6

was legal evidence to support the . . . decision." *Barton Contracting Co., Inc. v. City of Afton*, 268 N.W.2d 712, 718 (Minn. 1978). The decision is to be upheld if there is "any legal and substantial basis for the action taken." *Senior*, 547 N.W.2d at 416 (quotation omitted).

Dr. Gruenstein argues that the provost's determination that the university did not violate any of its policies in the nonrenewal of his appointment as a faculty member was arbitrary, unreasonable, and without evidentiary support.[1] In this certiorari review, we will examine each of the four university policies that Dr. Gruenstein claims were violated as a result of the nonrenewal of his appointment.

**Employee Performance Evaluation and Development Policy**

The Employee Performance Evaluation and Development policy provides that one of the guiding principles of the university's evaluation of employee performance is that "[t]he [u]niversity holds its leaders, responsible administrators, and supervisors accountable for actively supporting and engaging in the performance evaluation and development process in a fair and equitable manner." The policy also states that "[t]he [u]niversity expects ongoing evaluation of employee performance, with regularly

---

[1] On appeal to this court, Dr. Gruenstein also challenged the provost's determination that Dr. Gruenstein's nonrenewal did not violate university policy because of the director's alleged tortious interference with Dr. Gruenstein's employment. However, a tort claim that is separate and distinct from the government agency's employment decision and which does not involve any inquiry into the agency's discretionary decision is not subject to certiorari review. *Williams*, 820 N.W.2d at 814. Drawing upon this proposition, this court issued a special term order dismissing Dr. Gruenstein's tortious interference claim.

conducted and documented reviews of all employees administered according to applicable administrative policies, rules, and collective bargaining agreements."

Regarding this policy, the panel found that, although Dr. Gruenstein's performance evaluations had rated his performance as highly satisfactory for several years, his performance evaluations suddenly declined within a one-year period to rating his performance as unsatisfactory. The panel also determined that, although Dr. Gruenstein refuted the negative faculty reviews, his rebuttal and request for action were not addressed. The panel determined that the performance being evaluated included both Dr. Gruenstein's UMP and university responsibilities and observed that the evaluations were conducted by the department head and the director, who were Dr. Gruenstein's supervisors at both UMP and the university. Given these circumstances, the panel determined that "it [was] fair to say that the evaluation was of Dr. Gruenstein's roles at both [the university] and UMP." The panel concluded that the Employee Performance Evaluation and Development policy was violated.

The provost, in reviewing the panel's finding of a policy violation, concluded that, even assuming a violation occurred in 2013, it was not connected to and did not render "invalid the 2014 nonrenewal of Dr. Gruenstein's annually renewable appointment." The provost explained her decision as follows:

> As a [c]linical [s]cholar [t]rack faculty member, Dr. Gruenstein was employed on an annual contract that was subject to renewal at the discretion of the appointing authority. A nonrenewal of appointment is not grievable unless the nonrenewal violated a [u]niversity policy. The evidence and testimony established that the decision to non-renew Dr. Gruenstein's [u]niversity appointment—one year after the

8

performance evaluation—was based on the decision by UMP to terminate Dr. Gruenstein's employment—a decision not subject to [u]niversity review. A nonrenewal for that reason does not violate the Employee Performance Evaluation and Development policy.

In reaching this conclusion, the provost implicitly credited the testimony of the department head who declared that the termination of Dr. Gruenstein's employment at UMP and the nonrenewal of his appointment at the university was unrelated to any performance issues.

Dr. Gruenstein disputes the provost's conclusion that the March 7, 2013 performance evaluation was unrelated to the nonrenewal of his appointment, claiming that the negative evaluation "was a crucial element of the case [the director] was building against [him]," which "gave [the department head] the justification he needed to end Dr. Gruenstein's employment at the next logical opportunity." But, there is support in the record for the provost's conclusion. First, the nonrenewal occurred one year after the March 2013 evaluation by the director. During the year following the performance evaluation, Dr. Gruenstein continued to work as a professor at the university and received no disciplinary action as a result of the evaluation. Second, it is undisputed that at the time Dr. Gruenstein was notified that his at-will employment with UMP would end and his appointment with the university would not be renewed, he was advised by the department head that his termination and nonrenewal had nothing to do with his performance. In a follow-up to this advisory, months before Dr. Gruenstein filed his grievance petition, the department head provided a letter to Dr. Gruenstein stating that the nonrenewal action was not taken because of his performance and that Dr. Gruenstein continued to have effective professional relationships with his colleagues, undermining Dr. Gruenstein's contention

9

that the nonrenewal was premised upon the March 2013 evaluation. At the hearing, the department head reaffirmed that Dr. Gruenstein's performance was satisfactory and did not play a role in the nonrenewal decision.

Based upon this record and our limited scope of review, we conclude that the provost's determination that Dr. Gruenstein's nonrenewal did not violate this policy is neither arbitrary, unreasonable, nor unsupported by the evidence.

**Reporting and Addressing Concerns of Misconduct Policy**

The Reporting and Addressing Concerns of Misconduct policy provides that employees "are expected to report concerns if they have a good faith belief there has been a violation of local, state, or federal law or [u]niversity policy governing any [u]niversity activity." The policy further provides that "[n]o one acting on behalf of the [u]niversity may retaliate against an individual for having made a report in good faith under this policy."

The panel determined that this policy was violated because the department head failed to appropriately address Dr. Gruenstein's concern that the director had not provided an objective performance evaluation in March 2013. The provost, however, rejected this finding "[t]o the extent that the panel found that the nonrenewal of appointment therefore violated [u]niversity policy." The provost reasoned that, even assuming that the department head's conduct violated the policy, the violation was not connected to and did not render invalid the nonrenewal of Dr. Gruenstein's appointment.

Dr. Gruenstein argues that this policy was violated because his contract with the university was not renewed in retaliation for his May 21, 2013 letter regarding the alleged policy violations and the director's alleged mistreatment of him. Dr. Gruenstein points to

10

no specific evidence in the record supporting this assertion, but rather urges this court to infer that his contract was not renewed because he reported his concerns about the director's conduct. But, the provost implicitly credited the department head's testimony regarding the reasons for not renewing Dr. Gruenstein's contract. Furthermore, the March 2014 nonrenewal occurred a year after the performance evaluation at issue and ten months after Dr. Gruenstein's May 2013 letter. Because there is sufficient evidence in the record to support the provost's conclusion that any violation of this policy was unconnected with the nonrenewal decision, her determination that the nonrenewal did not violate the policy is not arbitrary, unreasonable, or without evidentiary support.

**Employee Recruitment and Retention Policy**

The Employee Recruitment and Retention policy states that "[t]he [u]niversity's recruitment and hiring practices shall comply with state and federal employment law and be consistent with applicable [u]niversity administrative policies, rules, and collective bargaining agreements." Dr. Gruenstein attempts to use this language to assert claims of tortious interference and defamation, as well as a violation of the Minnesota Whistleblower Act. The jurisdictional guidelines of the university's conflict resolution policy provide that the "Covered Subject Matter" of conflict resolution proceedings is limited to "allegation[s] of a violation of a specific [u]niversity rule, regulation, policy, or practice pertaining to employment." As the university persuasively argues, "[t]here is no indication that by including a general reference to its legal compliance commitment in one of its policies the [u]niversity intended to expand the specific 'Covered Subject Matter' language in the [j]urisdictional [r]equirements to include state law claims." In any case, the plain language

11

of the provision refers to "recruitment and hiring practices," which are not in dispute in Dr. Gruenstein's challenge to the university's nonrenewal decision.

In arguing that the university's nonrenewal decision violated the Employee Recruitment and Retention policy, Dr. Gruenstein also draws upon the provisions of the policy that mandates that "[t]he [u]niversity shall demonstrate its commitment to fostering and retaining its talented workforce by . . . [p]roviding a learning environment where employees are encouraged to grow and develop professionally with opportunities for career mobility and advancement" and by "[p]roviding policies within a supportive workplace that help employees effectively integrate and manage their work and personal life responsibilities." Dr. Gruenstein argues that the university violated these provisions of the policy because his request for minimal accommodations regarding starting his clinical work at UMP later two to three days a week in order to put his children on the school bus was unreasonably denied and because he was unreasonably denied leadership opportunities.

In considering these arguments, the panel found that the director's response to Dr. Gruenstein's request for an accommodation so that he could put his children on the school bus was "punitive." Nevertheless, the panel concluded that the director's actions did not fall within the panel's jurisdiction because they were related to Dr. Gruenstein's employment with UMP, not his work as a professor with the university. The provost accepted the panel's finding that there was no violation of this policy by the university. The provost's determination that Dr. Gruenstein's nonrenewal did not violate the "work and personal life responsibilities" portion of the policy is not arbitrary or unreasonable, as

12

the record supports the finding that the request for accommodations occurred within Dr. Gruenstein's employment with UMP.

Although Dr. Gruenstein explicitly alleged in his petition that the university had violated the "career mobility and advancement" provision of its policy, the panel did not make any specific findings with regard to this claim. Nevertheless, the record supports the panel's and the provost's determination that the Employee Recruitment and Retention policy was not violated. Dr. Gruenstein summarily concludes that his request for leadership opportunities was denied based on the director's "unreasonable concern for his own job and ill-will towards him." But, even if the panel had determined that the director violated the "career mobility and advancement" provision by denying Dr. Gruenstein's request for advancement opportunities, the provost credited the department head's testimony regarding the reasons for the nonrenewal. In any event, Dr. Gruenstein's claimed denial of leadership opportunities apparently occurred in 2011 or 2012, two or three years before the nonrenewal decision. Moreover, Dr. Gruenstein's argument that his opportunity for career advancement at the university was unreasonably denied is undermined by the fact that, despite the director's sudden withdrawal of support for the promotion in 2012, the university's board of regents nonetheless approved Dr. Gruenstein's promotion to the position of associate professor in the clinical scholar track for the following appointment term on May 13, 2013, two months after his March 2013 performance evaluation. Under these circumstances, the provost's determination that Dr. Gruenstein's nonrenewal did not violate the "career mobility and advancement" provision of the policy is not arbitrary, unreasonable, or without evidentiary support.

13

**Equity, Diversity, Equal Opportunity, and Affirmative Action Policy**

The Equity, Diversity, Equal Opportunity, and Affirmative Action policy states, among other things, that one of the principles guiding the university's commitment to equity, diversity, equal opportunity, and affirmative actions is that "the [u]niversity seeks to foster an environment that is diverse, humane, and hospitable." The policy also provides that the university shall "establish and nurture an environment for faculty, staff, students, and visitors that actively acknowledges and values equity and diversity and is free from racism, sexism, ageism, homophobia, and other forms of prejudice, intolerance, or harassment." Dr. Gruenstein alleges that the university failed to provide him a hospitable environment because he was subjected to the director's harassing conduct. The panel determined that the university had not violated this policy because Dr. Gruenstein was unable to produce evidence that the alleged harassment he experienced was in response to his membership in a protected class and because, while the director's behavior resulted in a non-nurturing environment, his behavior fell outside the panel's jurisdiction because it occurred within the director's role at UMP. The provost agreed with and accepted the panel's finding regarding the alleged violation of this policy.

Dr. Gruenstein argues that this provision of the policy was violated because the harassing conduct that he was subjected to led directly to the nonrenewal of his employment contract. But, the panel determined that the harassing conduct occurred within Dr. Gruenstein's employment with UMP and declined to find that the harassing conduct led to the nonrenewal of Dr. Gruenstein's university contract, and the provost agreed with these determinations. Because evidence in the record indicates that the

14

harassing behavior occurred within Dr. Gruenstein's UMP employment and that the nonrenewal decision was due to the university's decision to go in a different direction, rather than the result of any performance issues, the provost's determination that the nonrenewal did not violate this policy is not arbitrary, unreasonable, or without evidentiary support.

Finally, Dr. Gruenstein argues that all of the director's alleged misconduct must be taken into account in reviewing the university's nonrenewal decision because Dr. Gruenstein's nonrenewal was the product of the director's two-year campaign aimed at ending his UMP employment and his university appointment. Dr. Gruenstein further argues that the provost could not rely on the department head's testimony because he was the one that made both the decision to terminate his employment with UMP and the decision to not renew his appointment with the university.

The fact that the department head made both of the decisions, however, does not necessarily render his nonrenewal decision invalid. The provost reviewed all of the evidence, including the evidence of the director's misconduct, in making her decision. Because the department head testified that the nonrenewal of Dr. Gruenstein's appointment was not related to any performance issues, there was evidence supporting the provost's conclusion that the nonrenewal was not connected to any violation of the university's policies.

Dr. Gruenstein correctly notes that there was no requirement mandating the university's nonrenewal of his appointment simply because UMP terminated his employment. But, this fact does not render the university's nonrenewal of Dr. Gruenstein's

15

annual appointment invalid under its policies, especially in light of the department head's testimony that Dr. Gruenstein's salary for his work at the university was funded in part by the payment he received for clinical work at UMP. The department head also explained that it would not be economically feasible to retain Dr. Gruenstein as an employee of the university when he was not seen as a potential leader of the program going forward. Even if we disagreed with the provost's conclusion that any policy violations were not connected with the university's nonrenewal decision, we cannot conclude on this record that the provost's decision was arbitrary, unreasonable, or without evidentiary support.

**Affirmed.**