In re Billy and Tommie McKIBBEN, Debtors.

Tommie Lois McKibben

v.

Titus County Appraisal District, J.W. Terrell, Jr. Toby Abney, Jack Blackburn, Hulen Mike Reynolds and Gaylon Thompson.

Bankruptcy No. 95–51088.
Adversary No. A–96–5068.

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

April 23, 1999.

**380**

Glen Patrick, McNally & Patrick, L.L.P., Tyler, TX, for the debtors.

William M. Buechler and Cynthia S. Buechler, Austin, TX, for defendants.

## OPINION

DONALD R. SHARP, Chief Judge.

In this adversary proceeding, Tommie Lois McKibben seeks damages from the Titus County Appraisal District pursuant to 11 U.S.C. § 525. She alleges that the Appraisal District wrongfully terminated her employment as a result of her bankruptcy filing. Section 525 provides in pertinent part that:

> .. a governmental unit may not., terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title.., solely because such.., debtor is or has been a debtor under this title...

Tommie Lois McKibben seeks actual damages from the Appraisal District for her lost wages that resulted from the alleged unlawful termination of her employment.

Additionally, she seeks damages from the individual members of the Board of Directors of the Appraisal District pursuant to 42 U.S.C. § 1983. She alleges that the individual board members deprived her of her right, guaranteed by § 525 of title 11, to not be discriminated against in her employment because of her bankruptcy filing. Section 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured in an action at law ...

In addition to joint liability for actual damages, she seeks punitive damages, costs and attorneys fees from the individual board members of the Appraisal District.

Prior to the trial of this case, the Defendants moved the Court to dismiss the case for failure to state a claim upon which relief can be granted. The Motion challenged the Court's jurisdiction and raised the defense of qualified immunity for the individual defendants. The Motion to Dismiss was heard by the late C. Houston Abel wherein he determined that jurisdiction was proper and deferred a ruling on the defense of qualified immunity with a requirement that Plaintiffs' replead that cause of action. The Plaintiffs did amend their pleadings and Defendants then filed a Motion for Summary Judgment which again asserted the defense of qualified immunity as to the individual board members. The Motion for Summary Judgment was also denied on the basis that the Defendants were not able to demonstrate that as a matter of law, they were entitled to assert the defense of qualified immunity. The individual Defendants, while denying the merits of the case, maintain their defense of qualified immunity in this action.

Prior to the trial of this case, the parties stipulated to the following facts:

1. Titus County Appraisal District is a political subdivision of the State of Texas.

2. Tommie Lois McKibben was employed as the chief appraiser of the Titus County Appraisal District from September 1991 to March 4, 1996.

3. On August 28, 1995 Tommie Lois McKibben filed a voluntary petition under Chapter 13 of the United States Bankruptcy Code.

4. Tommie Lois McKibben was terminated from her employment as chief appraiser of the Titus County Appraisal Dis-

trict on March 4, 1996 by the unanimous vote of the Board of Directors.

5. The Board of Directors of the Titus County Appraisal District on March 4, 1996 consisted of J.W. Terrell, Jr., Toby Abney, Jack Blackburn, Hulen Mike Reynolds and Gaylon Thompson.

6. At the time Tommie Lois McKibben's employment was terminated she was receiving an annual salary of $42,650.00, an annual car allowance of $3,600.00, medical insurance at an annual cost of $2,325.00 and a retirement benefit of $2,968.00 per year.

The case came before the Court and was heard pursuant to regular setting and following the presentation of evidence, the parties were instructed to file briefs after which the matter would be taken under advisement. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 and disposes of all issues in the adversary proceeding.

### Discussion

██ 11 U.S.C. § 525(a) prevents a *governmental unit* from terminating a person's employment as a result of filing bankruptcy. Section 101(27) of the Bankruptcy Code defines governmental unit to include a State or department, agency or instrumentality of a State. The parties stipulated that the Titus County Appraisal District is a political subdivision of the State of Texas. Accordingly, the Appraisal District is a governmental unit under § 525 of title 11.

██ In a case such as this, it is unlikely that a governmental unit, aware of the provisions of § 525(a) will admit that the only reason for its action was the bankruptcy. *In re Metro Transp. Co.*, 64 B.R. 968 (Bkrtcy.E.D.Pa.1986). One must look to the objective evidence presented and draw reasonable inferences from that evidence as to the subjective intent of the parties involved. This Court was presented with considerable testimony and docu-

mentary evidence from which an analysis can be made.

Plaintiff served as chief appraiser of the Titus County Appraisal District for four and one-half years. In May of 1994 Plaintiff's overall job performance was rated as *"very good"* by the Board of Directors of the Appraisal District. (Exhibit 15). In July of 1995 the Directors listed Plaintiff's job performance as *"above average"* and noted that the "overall development of the Appraisal district improved." (Exhibit 16). In July of 1995 the Directors approved the budget for the upcoming year which included an increase in salary for Plaintiff. The Directors noted a need for improvement in public relations in the July 1995 job evaluation. This concern was noted in her rating as to that aspect of her job, but it was still rated as satisfactory. In fact, as to each factor used to rate her performance, the lowest rating given was satisfactory. In no job evaluation presented to the Court was she ever given an unsatisfactory rating in any factor of job performance. The Board Members testified that the assistant chief appraiser, Matt Davis, was the primary source of public relations problems for the District.

On November 22, 1995, the Mount Pleasant Daily Tribune printed a front page article disclosing Plaintiff's bankruptcy. (Exhibit 17). Mike Reynolds was quoted in the article as being unsure how the bankruptcy would affect Plaintiff's job. "I will have to study it," he said. "It is a grave concern but I'm not sure what it means." In the same article Mike Reynolds stated that Plaintiff's work had been satisfactory "on all accounts" and credited Plaintiff with "dramatically improving the district." Toby Abney testified that the bankruptcy was embarrassing to the Plaintiff, to the Appraisal District, to everyone including himself. Jack Blackburn didn't like surprises. The portion of his deposition testimony that was read into evidence revealed that he was surprised by the bankruptcy filing. Gaylon Thompson was shocked by the amount of the debt. J.W.

Terrell admitted on cross examination that he was concerned with the way the Plaintiff was viewed in the public.

The first meeting of the Board of Directors after the November 22, 1995 article was held on January 22, 1996. Plaintiff testified that in the meetings prior to January of 1996, she was not excluded from executive sessions unless the Board was evaluating her performance. However, beginning with the January 22, 1996 meeting the Board excluded Plaintiff from at least a portion of the executive sessions.

The defendants' testified that the Plaintiff's bankruptcy was not discussed during the executive sessions of the Board meetings. However, their testimony concerning the executive sessions is inconsistent and conflicts with the documentary evidence. Exhibit 4, the agenda for the January 22, 1996 meeting, shows that one of the items to be considered at the meeting was a complaint from Mr. Cromwell against an employee of the district. (Exhibit 4). The minutes of the January 22, 1996 meeting show that Philip Cromwell presented a letter to the Board (Exhibit 11). The letter was introduced into evidence as Exhibit 21. (Exhibit 21). In the letter, Mr Cromwell called on the Board to discharge Plaintiff as chief appraiser for resorting to bankruptcy protection.[1] Plaintiff testified that after the letter was given to the Board they went into executive session. Before Plaintiff was excluded from the executive session she heard Mr. Abney asked Mr. Blackburn if he saw the second page of the letter to which Mr. Blackburn replied yes. Mr. Abney admitted during the first day of the trial that this exchange took place at the January 22, 1996 meeting.

Exhibit 11 shows that the Board went into executive session on January 22, 1996 to consider litigation and personnel matters. All of the defendants who testified during the first two days of the trial stated that they could not remember any discus-

sions about personnel during the executive session of the January 22, 1996 meeting. However, during the third day of the trial Mr Terrell claimed that Plaintiff was excused from the January 22, 1996 executive meeting because he had some things he wanted to say to the rest of the Board about the Plaintiff And yet, Mr. Terrell had testified earlier that he did not remember what was said about personnel at the January 22, 1996 meeting.

Exhibit 11 also shows that at the conclusion of the January 22, 1996 meeting Plaintiff was informed that a meeting would be called in a week or so when Mr Reynolds would be present. One of the purposes of the meeting was to discuss personnel. (Exhibit 11, page 3). The defendants' testimony that the bankruptcy was not discussed during the executive sessions of the January 22 and January 29 meetings is not credible. The issue was raised by a letter to the Board from Mr. Cromwell, Mr Blackburn asked Mr Abney a question about the letter, the Board went into executive session to consider personnel matters, and then agreed to meet in another week to consider personnel matters. Furthermore, Plaintiff was excluded from a portion of the executive sessions on both January 22 and January 29. This Court simply does not believe that the defendants did not even mention Plaintiff's bankruptcy during these executive sessions. At the February 26, 1996 board meeting, the auditor reported to the board that everything was in order and that the operations of the district looked good. (Exhibit 13) Those minutes reveal no adverse information as to Plaintiff's job performance but Gaylon Thompson, the Chairman of the Board, testified that Plaintiff's job was at risk as early as the February 26, 1996, meeting. This Court is convinced that the Board had determined by the February 26, 1996, meeting to discharge Plaintiff because they were unhappy with her bankruptcy filing. At that

---

1. Other evidence demonstrated that Philip Cromwell had been waging a campaign for all of Plaintiff's tenure to have her removed from office.

meeting, the Board created a list of questions for Plaintiff and Matt Davis, her Chief Deputy, to answer. Another Board meeting was scheduled for March 4, 1996, at which Plaintiff was to present her responses to the questions. Both the questions and the responses (Exhibit 25) were admitted into evidence. The five questions all dealt with events that occurred prior to the November 22, 1995, article disclosing Plaintiff's bankruptcy filing. There was evidence that convinces this Court that all of those events were known to the Board prior to the disclosure of the bankruptcy filing, but there is no evidence that the Board took any action in connection with any of the events prior to learning of Plaintiff's bankruptcy filing. The members of the Board of Directors testified that they viewed the Plaintiff's answers to the questions propounded as vague, defensive, and evasive. The questions and answers belie this position. They were straight forward and gave no indication that Plaintiff was attempting to evade any responsibility for any action she had taken.

It is apparent from the totality of the circumstances that the Directors determined as a group that the Plaintiff would be discharged because of the bankruptcy filing. This decision was made at or before the February 26, 1996, Board meeting. It is also apparent that the list of questions given to her to be answered at the specially called meeting eight days later was nothing more than an attempt by the Board of Directors to create a "paper trail" that would be some justification for their formally announcing her discharge.

The Board attempted to defend its position at trial by presenting evidence concerning meetings that took place in May of 1995 and events that took place in the early summer of 1995. The evidence was totally unconvincing as a demonstration of a reason to discharge the Plaintiff in early 1996. It is clear that there were several meetings between various Board members and other county agencies and their representatives. These were meetings that dealt with ongoing problems and issues that had to be resolved in connection with the day-to-day operation of the county's business. It is clear that there were some tensions between some of the agencies and the Tax Appraisal District, but it is disingenuous for the Board to evaluate the Plaintiff in July of 1995 and effectively praise her work at that point when all of the problems in the early summer were known. It simply does not ring true that those problems were of such magnitude that she should be discharged in early 1996 when they were not considered of such magnitude in July of 1995 to have even merited a mention on her job performance evaluation.

Specifically, the defense offered the testimony of David Anthony, the superintendent of the Texas City Independent School District and formerly the superintendent of the Mount Pleasant Independent School District. Mr. Anthony's connection was that as superintendent of Mount Pleasant Independent School District in Titus County, he had to deal with Mrs. McKibben each year to set the "effective tax rates" for the school district. Mr. Anthony was eager to offer his opinion that Mrs. McKibben was not qualified to be chief appraiser but there was no indication as to Mr. Anthony's expertise which would qualify him to make such an assessment. He testified that he was present when she assumed the job in 1991 from the previous chief appraiser who had been dismissed because of criminal activity. Mr. Anthony offered the opinion that the problems Mrs. McKibben started with in 1991 continued each year and the principal problem that he saw was her inability to produce accurate appraisal values. On cross-examinations it developed that he did not recall the effective tax rate determination being a problem in 1995 and that he never had to republish any tax rate figures because of the errors in appraised values that he testified to earlier; and as to her qualifications for the job, it developed that his opinion was based on observing her work

from 30 minutes to one hour each year during the "effective tax rate calculation." His testimony is simply not credible.

The defense also spent a great deal of time with various officials from TU Electric, which is the largest single tax payer in Titus County. It was apparent that TU Electric and Mrs. McKibben had been at odds since 1992. There had been ongoing controversy over the valuation of their properties and TU officials had used the various legal avenues available to them (as any prudent tax payer would) to minimize the impact of the taxes they were required to pay. Although that controversy had dated from the inception of Mrs. McKibben's employment, she had never been criticized for her handling of the TU matters until after she filed bankruptcy. Additionally, the principal dispute over the valuation of the property had already been appealed to the Appraisal Review Board and Mrs. McKibben's position had been affirmed by that Board. The evidence concerning this issue demonstrated nothing more to this Court than the ongoing interaction between a large tax payer taking advantage of all appropriate avenues to hold down its tax liability. There was nothing unusual concerning that activity and certainly no evidence that Mrs. McKibben had ever been criticized by the Board or placed on notice that her job was in danger because of her dealing with TU Electric prior to the public knowledge of her bankruptcy filing.

█ These controversies along with the other minor controversies presented by the Defendants are nothing more than an attempted after the fact justification for the actions of the Board. The only controversy presented by the Defendants that had been discussed prior to the bankruptcy filing as a job problem was the public relations aspect of her job which centered around her inability to control Matt Davis, the Chief Deputy who was rude and uncooperative to citizens. That controversy continued to the March 4 meeting in which Mrs. McKibben was fired and Matt Davis

continued his employment. This Court can come to no other conclusion but that the Board of Directors fired Mrs. McKibben because they were embarrassed that she had filed bankruptcy and it became public knowledge.

█ In addition to the claims against the Appraisal District, Plaintiff asserts a cause of action against the individual Board members under 42 U.S.C. § 1983. The stipulations recited earlier clearly establish that Titus County Appraisal District is a governmental unit of the State of Texas and that therefore, any action taken by the Board of Directors in their official capacity is an action taken under color of state law. There can be no denying that the Defendants' actions to terminate the Plaintiff's employment was an official act taken under color of state law.

The individual Defendants have again asserted the defense of qualified immunity from suit. Their position is that as members of the Board of Directors, they are shielded from personal liability under the doctrine of qualified immunity. Qualified immunity protects public officials against the risk of trial and personal liability for the consequences of their actions taken to carry out their duties if there is no violation of well established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) Government officials are not personally liable for damages under § 1983 unless the right in question was clearly established at the time of the alleged violation. In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) the United States Supreme Court noted that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 11 U.S.C. § 525 clearly establishes the contours of the right violated by the individual defendants in this case. The Plaintiff had the right to not be terminated from her employment because she filed bankruptcy.

A number of Courts have recognized a person's right to recover damages under 42 U.S.C. § 1983 for the deprivation of rights secured by the Bankruptcy Code. In *In re Maya*, 8 B.R. 202 (Bkrtcy.E.D.Pa. 1981) the court wrote that "... we conclude that Section 1983 may be used to redress the deprivation of a right guaranteed by any federal statute, including the Bankruptcy Code ..." In *Higgins v. Philadelphia Gas Works*, 54 B.R. 928, 934 (D.C.1985) the Court stated that "Section 1983 provides a remedy for those rights guaranteed by the federal bankruptcy statutes." See *In re Watts*, 93 B.R. 350 (E.D.Pa.1988) rev'd on other grounds 876 F.2d 1090 (3rd Cir.1989) (Section 1983 action based on violation of § 525(a) of Title 11).

Defendants argue that 42 U.S.C. § 1983 is a derivative action and that claims of bankruptcy discrimination under 11 U.S.C. § 525 cannot serve as a vehicle for § 1983 claims. They cite *Jackson v. City of Atlanta*, 73 F.3d 60 (5th Cir.1996). Defendants reliance on *Jackson* is misplaced. *Jackson* deals with the well established rule that a Title 7 and 1983 action do not lie for the same acts of discrimination. Defendants should look to *Johnston v. Harris County Flood Control District*, 869 F.2d 1565 (5th Cir.1989), cert. denied 493 U.S. 1019, 110 S.Ct. 718, 107 Lawyers' Ed.2d 738 which explains that where a separate constitutional or statutory right of the United States has been violated then § 1983 affords a remedy to the injured party. That is precisely the situation in this case where the Plaintiff's right not to be fired from her job because she filed a bankruptcy petition has been violated under color of state law. In summary, the protection afforded by 11 U.S.C. § 525 is clear. There is nothing vague or ill defined about the terms of the statute which prohibit any employment termination because of a bankruptcy filing. That is a federal statutory right and the individual members of the Board of Directors of the Titus County Appraisal District have violated that right by voting unanimously to terminate the Plaintiff herein.

The parties stipulated that Plaintiff was terminated from her job at the Titus County Appraisal District effective March 4, 1996. In addition, the parties stipulated that Plaintiff was receiving an annual salary of $42,650.00 and benefits totaling another $8,893.00 per year. Plaintiff was not successful in finding employment until December 1, 1997 when she was hired as chief appraiser of the Wood County Appraisal District.

Plaintiff was unemployed for a period of 636 days. Plaintiff's salary and benefits for this period total $89,812.00.

Plaintiff testified that she receives an annual salary of $39,500.00 from Wood County plus reimbursement for mileage, insurance and retirement benefits. The only other evidence on this issue was the testimony of Mike Reynolds. Mike Reynolds testified that the Plaintiff was making the same if not a little more than she made at Titus County. However, Mr. Reynolds admitted on cross examination that he based his testimony not on first hand knowledge but on what he was told by the chief appraiser of Titus County. Furthermore, Mr Reynolds admitted that he did not know the exact amount of the Plaintiffs salary at Wood County.

Although Plaintiffs benefits are in many ways comparable to the benefits she received at Titus County, her salary is nonetheless $3,150.00 less than she was receiving at Titus County. In addition, Plaintiff testified that she owns a home in Titus County and must drive to Wood County to work. Whatever unemployment Plaintiff received is more than offset by the reduction in salary and increase in travel expenses required to get to and from her job in Wood County.

■ Plaintiff is entitled to judgment against all of the defendants jointly and severally for her actual damages for lost wages. Plaintiff calculated her lost wages

at $89,812.00. There was no evidence to contradict this calculation and in fact Defendants did not contest the amount of damages but relied entirely on their attempt to prove that there was no liability on the part of any of the Defendants. The Court therefore awards damages . in the amount requested by Plaintiff, $89,812.00.

Plaintiff also seeks to recover her costs and attorneys fees from the individual defendants. The only evidence on the costs and attorneys fees incurred by Plaintiff was the testimony from Plaintiff's attorney that his firm agreed to represent the Plaintiff for a one-third contingency fee. He testified that a one third contingency fee is a usual and customary fee for cases such as this one and asked that the total amount of damages awarded to Plaintiff be increased by one third for attorneys fees. In addition, he testified that the filing fee and deposition costs in the case were not less than $2,000.00. No other evidence was offered on costs or attorney fees.

 The Defendants offered no evidence dealing with the reasonableness of the attorney fees or expenses requested. The Defendants simply maintained their position that attorney fees were unavailable under the applicable provisions of the Bankruptcy Code. The Supreme Court explained the American rule regarding attorney fees in *Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The general rule is that each party to a lawsuit must bear his or her own costs and the prevailing litigant cannot collect attorney fees from the losing litigant as a general rule. There are five specific exceptions to the rule which allow attorney fees when (1) a statute authorizes them, (2) a provision in a contract allows them, (3) when a litigant has deliberately disobeyed a court order, (4) when a litigant has acted in bad faith, and (5) when a litigant recovers a common fund for the benefit of a group. The Defendants are correct as to the provisions of the Bankruptcy Code and the applicability of attorney fees to the

Titus County Appraisal District. Section 525 of the Bankruptcy Code does not authorize attorney fees to a prevailing litigant and none of the other exceptions are applicable. Of course, Plaintiff has not requested attorney fees against the Titus County Appraisal District.

The Plaintiff has requested attorney fees against the individual Defendants and to analyze that request, we must turn to 11 U.S.C. § 1988 which provides that the prevailing party is entitled to attorney fees in a successful action brought pursuant to 42 U.S.C. § 1983. As to the individual Defendants, this is an action brought pursuant to 42 U.S.C. § 1983 so we must look to 42 U.S.C. § 1988 to determine whether prevailing Plaintiff in this instance recovers attorney fees from the individual Defendants.

 This Court finds that it cannot award attorney fees based on the record before it. There is no question but that § 1988 allows attorney fees, but the body of jurisprudence interpreting this statutory provision sets forth very specific and detailed provisions as to how those attorney fees must be calculated. An appropriate place to begin the analysis is with the case of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 Lawyers' Ed.2d 40 (1983). In that case, the Supreme Court directed trial courts to make an initial estimate of reasonable attorneys' fees by applying a reasonable hourly rate to the hours reasonably expended on successful claims. This is the classic "Lodestar" calculation which is pervasive throughout federal jurisprudence dealing with the awarding of attorney fees. That Lodestar calculation can then be adjusted by other factors the most common ones are the so called *Johnson* factors set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.* The Supreme Court has reiterated that position in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 Lawyers' Ed.2d 891 (1984) and *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 Lawyers' Ed.2d 67 (1989). It is clear that an award of attorney fees requires the

trial court to evaluate and explain that award of attorney fees in light of the "Lodestar" approach and any adjustment to the "Lodestar" amount pursuant to the "*Johnson*" factors. Failure to do so is reversible error. *U.S. Leather, Inc. v. H. & W. Partnership*, 60 F.3d 222 (5th Cir. 1995).

In the case before us, this Court has absolutely no evidence upon which it can make an attorney fee award. The testimony as to the agreement between the Plaintiff and her attorney for a one-third contingency fee is only evidence of the agreement between those two parties. It is no evidence of the reasonable number of hours worked or the reasonable hourly rate to be applied to those hours to arrive at a reasonable attorney's fee to be assessed against the losing Defendants. The same lack of evidence applies as to the reasonable cost since the only testimony is Plaintiff's attorney's totally unsupported statement that total cost and expenses were not less than $2,000.00. Accordingly, the request for attorney fees and expenses must be DENIED.

There is also a request by Plaintiff for punitive damages which this Court must deny. Although there was some indication that J.W. Terrell held personal animosity against the Plaintiff, there was no evidence to indicate that the Board acted with malicious intent or reckless disregard for the rights of the Plaintiff. The evidence establishes that the Board of Directors terminated the Plaintiff's employment because they were embarrassed by the public knowledge of the bankruptcy filing and rather than resist what they felt to be the pressure of public opinion, they discharged the Plaintiff. This was a wrongful action but does not constitute willful and malicious activity that requires punitive damages be assessed. Accordingly, the Plaintiff's request for punitive damages is DENIED.