Georgina Y. STEPHENS, Relator,

v.

BOARD OF REGENTS OF the UNIVERSITY OF MINNESOTA, et al., Respondents.

No. C1–99–2109.

Court of Appeals of Minnesota.

July 25, 2000.

Review Denied Sept. 26, 2000.*

* PAGE, J., took no part in the consideration or decision of this case.

Karl A. Oliver, Oliver & Associates, PLC, Roseville, for relator.

Mark B. Rotenberg, General Counsel, University of Minnesota, Thomas J. Schumacher, Associate General Counsel, Minneapolis, for respondents.

Considered and decided by LANSING, Presiding Judge, RANDALL, Judge, and WILLIS, Judge.

## OPINION

WILLIS, Judge.

Relator Georgina Y. Stephens seeks review by writ of certiorari of the decisions of the University of Minnesota to reassign her from her duties as associate vice president and treasurer and to not renew her contract with the university. We discharge the writ of certiorari.

## FACTS

In 1997, relator Georgina Y. Stephens accepted a position as the University of Minnesota's "Associate Vice President for Finance and Operations and Treasurer." In September 1999, a former employee in Stephens's department alleged to the university that Stephens had engaged in misconduct in litigation to which Stephens was party before she was employed by the university. After a preliminary investigation, university officials met with Stephens on October 18, 1999, and asked her to comment on her conduct during that litigation and her failure to disclose that litigation in a residential-loan application she made in 1993. On October 20, the university told Stephens that she would be placed on paid administrative leave while it investigated further to determine whether, and to what extent, her conduct outside the university affected her ability and fitness to continue in her position.

On November 8, 1999, university officials interviewed Stephens as part of the university's continuing investigation. During this interview, Stephens acknowledged that (1) in 1993, she failed to disclose in a residential-loan application that she was a party to a lawsuit, despite the application's request for disclosure of such information; (2) in 1996, a Minnesota district court concluded that Stephens had lied in submissions to the court, and the court would no longer meet with her without a court reporter present; (3) the same district court later "specifically found" that Stephens's purported real-estate transactions at issue were a "fake and a sham";[1] (4) Stephens failed to file federal and state income-tax returns for "several years" before the university reached its decisions;[2] and (5) in both her 1998 chapter 7 bankruptcy petition and her 1999 chapter 13 bankruptcy petition, Stephens failed to disclose her

---

1. This court affirmed the district court's decision, though not specifically addressing this particular finding of fact, in *Stephens v. Chrysler First Fin. Servs. Corp.*, No. C0–97–153, 1997 WL 457448 (Minn.App. Aug.12, 1997), *review denied* (Minn. Sept. 12, 1997).

2. The record shows that Stephens and her husband failed to file income-tax returns from 1994 through 1997.

husband's bankruptcy filings despite the petitions' requests for disclosure of such information. Also on November 8, Stephens filed a grievance with the university grievance office but later suspended her grievance, pending the outcome of the university's investigation.

On November 10, 1999, the university associate general counsel responsible for the investigation concluded that the district court's findings in 1996, Stephens's failure to disclose required information in her bankruptcy petitions, and Stephens's failure to file her tax returns "each separately and together make her uninsurable" under the university's fidelity-and-crime insurance policy. In a November 20, 1999, letter from the university's president, Mark Yudof, the university notified Stephens that it had concluded that it would be "inappropriate" for her to return to her then-current position and duties at the university, but that the university would "honor the remainder of [her] contract either by reassigning [her] or by some other arrangement." She then "restarted" the grievance process by filing an amended grievance on November 21.

In a December 1, 1999, letter from President Yudof and Patricia Spence, chair of the university's board of regents, the university notified Stephens that her contract, which was to expire on June 30, 2000, would not be renewed. On December 3, 1999, the university notified Stephens that "[e]ffective immediately, you are relieved of all your current associate vice president and treasurer responsibilities." Stephens was assigned to other duties and was to maintain her salary level and title of associate vice president until the end of her contract and her title of treasurer until the board of regents removed the title.

A grievance officer, acting under the *University of Minnesota Grievance Policy,* scheduled a meeting between President Yudof and Stephens for December 15, 1999. But in a letter dated December 14, one day after Stephens petitioned this court for certiorari review of the universi-ty's decisions to reassign her and to not renew her contract, Stephens notified the university that she was withdrawing from the university's grievance process and cancelled the meeting with President Yudof.

Among the numerous claims Stephens includes in her petition for certiorari review, Stephens alleges that, through its decisions to reassign her and to not renew her contract, the university defamed her, retaliated against her because of her public statements regarding the university, violated her due-process rights, and discriminated against her because she had filed for bankruptcy. Stephens also alleges that the university breached her contract and violated its own policies in reaching the decisions challenged here, which she claims are arbitrary and capricious.

## ISSUES

1. Are materials submitted to this court that were not considered by the university in reaching the decisions challenged in this certiorari appeal properly part of the appellate record?

2. Is Stephens's claim that the university discriminated against her, in violation of 11 U.S.C. § 525 (1994), because she filed for bankruptcy properly brought by writ of certiorari?

3. Is Stephens's challenge by writ of certiorari to the university's decisions that adversely affected her employment properly before this court despite her failure to exhaust the university's grievance process?

## ANALYSIS

■ Stephens appeals by writ of certiorari the University of Minnesota's decisions to reassign her from the duties she had as associate vice president and treasurer and to not renew her contract. *See generally* Minn.Stat. § 606.01–.06 (1998) (providing for review by writ of certiorari); *Shaw v. Board of Regents,* 594 N.W.2d 187, 191 (Minn.App.1999) (holding that as a general rule, certiorari is "the only method available for [judicial] review of a universi-

ty decision"), *review denied* (Minn. July 28, 1999). Our certiorari review of a decision of the university is limited to an inspection of the record developed by the university in reaching its decision and is necessarily confined to questions affecting the jurisdiction of the decision-maker, the regularity of the proceedings, and, regarding the merits of the dispute, whether the decision was "arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it." *Ganguli v. University of Minnesota*, 512 N.W.2d 918, 921 (Minn.App.1994) (quoting *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn.1992) (quotation omitted)).

## I. Requests to Strike and to Supplement Record

 Stephens asks this court to strike eight exhibits from the record provided by the university. The record in a certiorari appeal comprises the papers, exhibits, and transcripts of any testimony considered by the body whose decision is to be reviewed. *See* Minn. R. Civ.App. P. 110.01; Minn. R. Civ.App. P. 115.04 (providing that rule 110 should be applied to certiorari proceedings "[t]o the extent possible"); *In re Demotion of Dillenberger*, 486 N.W.2d 17, 21 (Minn. App.1992). This court may not base its decision on matters outside of the record on appeal. *Plowman v. Copeland, Buhl & Co.*, 261 N.W.2d 581, 583 (Minn.1977). Thus, this court will grant a party's request to strike materials that are not part of the appellate record. *Fabio v. Bellomo*, 489 N.W.2d 241, 246 (Minn.App.1992), *aff'd*, 504 N.W.2d 758 (Minn.1993).

 Stephens asks this court to strike exhibits 1 and 2, which are affidavits of university officials dated January 10, 2000. Because the university decisions challenged here were made no later than December 3, 1999, it is clear that these affidavits were not considered by the university in reaching those decisions. We therefore grant Stephens's request to strike the two affidavits.

 Stephens also asks this court to strike exhibits 3 through 8 because, she alleges, (1) she had not seen these exhibits until the university submitted them as part of the record in response to this court's writ of certiorari; (2) there is no evidence that the exhibits were generated before the university reached its decisions; (3) there is no evidence that the university considered the exhibits; and (4) there is no indication that the submitted exhibits are complete reproductions of the documents considered. But it is of no legal significance that Stephens did not previously view the entirety of the record developed by the university in reaching its decisions, and Stephens provides no citation to legal authority or any legal analysis in support of her request to strike exhibits 3 through 8. We therefore deny her request. *See* Minn. R. Civ.App. P. 128.02, subd. 1(d) (providing that appellant's argument must be accompanied by citations to relevant authority and analysis); *State, Dep't of Labor & Industry v. Wintz Parcel Drivers, Inc.*, 558 N.W.2d 480, 480 (Minn.1997) (declining to address issue not adequately briefed); *Whalen ex rel. Whalen v. Whalen*, 594 N.W.2d 277, 282 (Minn.App.1999) (declining to address issues unsupported by citation to relevant law or legal analysis).

 In her reply brief, Stephens requests leave to supplement the record with additional documents, pursuant to Minn. R. Civ.App. P. 110.05. Rule 110.05 provides that this court, "on motion by a party or on its own initiative," may direct that the record be supplemented with a document that was considered by the administrative decision-maker but is either omitted from the record "by error or accident" or is misstated in the record. Minn. R. Civ.App. P. 110.05; Minn. R. Civ.App. P. 115.04; *see Stanek v. A.P.I., Inc.*, 474 N.W.2d 829, 831–32 (Minn.App.1991) (supplementing district court record on court's own initiative), *review denied* (Minn. Oct. 31, 1991). But Stephens raised this request in her reply brief, rather than by

filing a motion in the form required by Minn. R. Civ.App. P. 127. *See* Minn. R. Civ.App. P. 127 (describing required appellate court motion procedure). And even if her request to supplement the record were properly before us, Stephens does not assert that the documents she seeks to add to the record were considered by the university. We therefore deny Stephens's request to supplement the record.[3]

The university requests that this court strike Stephens's affidavit dated February 11, 2000. We grant the university's request because the affidavit could not have been considered by the university in reaching its decisions challenged here. *See Plowman,* 261 N.W.2d at 583; *Fabio,* 489 N.W.2d at 246. The university also requests that we strike "many other documents outside the [r]ecord" that are attached to Stephens's brief, without identifying those documents with particularity. We are unwilling to grant a request to strike where the requesting party fails to identify specifically the materials it wants stricken and, therefore, deny the university's broad request. *Cf.* Minn. R. Civ.App. P. 127 (providing that motion "shall state with particularity the grounds" for relief sought).

## II. Scope of Certiorari Review

In *Stephens v. Board of Regents,* No. C1–99–2109 (Minn.App. Dec. 30, 1999) (or-

der), this court questioned whether Stephens's claims of defamation, retaliation, violation of due process, and bankruptcy discrimination should "be dismissed as outside the scope of a certiorari appeal." We subsequently deferred resolution of these questions to our determination on the merits of Stephens's appeal. *Stephens v. Board of Regents,* No. C1–99–2109 (Minn. App. Jan. 18, 2000) (order).

### A. Defamation, Retaliation, and Violation of Due Process

Stephens's claims of defamation, retaliation, and violation of due process are not properly before us. She offers no citation to legal authority and no legal analysis in support of her defamation claim. And Stephens only cites to the constitutional provision she alleges applies to her retaliation claim and offers no supporting legal analysis. We decline to address these claims and, therefore, need not determine whether the claims are within the scope of certiorari review. *See* Minn. R. Civ.App. P. 128.02, subd. 1(d); *Wintz Parcel Drivers,* 558 N.W.2d at 480; *Whalen,* 594 N.W.2d at 282; *State v. Modern Recycling, Inc.,* 558 N.W.2d 770, 772 (Minn.App.1997) (declining to address issue unsupported by legal analysis).[4] And

3. This court may consider cases, statutes, rules, and scholarly journal articles not presented or considered below. *See Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.,* 535 N.W.2d 337, 340 n. 3 (Minn.1995); *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.,* 480 N.W.2d 368, 376–77 (Minn.App.1992), *review denied* (Minn. Mar. 26, 1992). Thus, those portions of Stephens's brief and appendix that contain or refer to such materials are properly before us.

4. Stephens identified in her statement of the case significantly fewer claims to be raised on appeal than she did in her petition for certiorari review. Thus, in our December 1999 order, we limited our questions to the parties regarding the scope of certiorari review to those claims that were identified in Stephens's statement of the case. But Stephens purports to raise in her brief the additional

claims she identified in her petition, including allegations of race discrimination, sex discrimination, denial of equal protection, interference with free speech, tortious interference with prospective business advantage, tortious interference with contract, fraud and misrepresentation, publication of private facts, intrusion upon seclusion, breach of fiduciary duty, violation of the Minnesota government data practices act (Minn.Stat. §§ 13.01–.99 (1998)), intentional infliction of emotional distress, and indemnification for costs and attorney fees. We decline to address these claims, however, because Stephens provides no citation to relevant authority or legal analysis in support of any of these claims. *See* Minn. R. Civ.App. P. 128.02, subd. 1(d); *Wintz Parcel Drivers,* 558 N.W.2d at 480; *Whalen,* 594 N.W.2d at 282; *Modern Recycling,* 558 N.W.2d at 772.

because Stephens presents no argument in her brief alleging any deprivation of due process, she has waived that claim. *See Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982).

## B. Bankruptcy Discrimination

▆▆▆▆ Both Stephens and the university argue that Stephens's allegation that the university discriminated against her in violation of the Bankruptcy Code may be brought by writ of certiorari. "[I]n the absence of an adequate method of review or legal remedy," judicial review of the decisions of administrative bodies "must be invoked by writ of certiorari." *Dietz v. Dodge County,* 487 N.W.2d 237, 239 (Minn. 1992). But when a party has a statutory cause of action by which to pursue a claimed statutory violation by an administrative decision-maker, review of that claim by writ of certiorari is not appropriate even if "prosecution of the alleged violation * * * may implicate at least some aspects of the [administrative] decision." *Willis v. County of Sherburne,* 555 N.W.2d 277, 283 (Minn.1996); *Manteuffel v. City of North St. Paul,* 538 N.W.2d 727, 729–30 (Minn.App.1995).

▆▆▆▆ Stephens argues that the university's decisions to reassign her from her duties as associate vice president and treasurer and to not renew her contract violate the proscription in 11 U.S.C. § 525 (1994) of discriminatory treatment of persons who have filed for bankruptcy. But there is a statutory cause of action for redress of discrimination in violation of section 525. *Lesniewski v. Kamin,* 246 B.R. 202, 213 (Bankr.E.D.Pa.2000) (stating that a person alleging violation of section 525 has a private right of action under section 525 and 28 U.S.C. § 1471); *McKibben v. Titus*

*County Appraisal Dist.,* 233 B.R. 378, 384–85 (Bankr.E.D.Tex.1999) (holding that a person alleging violation of section 525 has a cause of action pursuant to 42 U.S.C. § 1983). Because Stephens may pursue a statutory cause of action for redress of her allegation that the university violated section 525, her claim that the university discriminated against her because she filed for bankruptcy is beyond the scope of certiorari review.[5]

## III. Stephens's Failure to Exhaust the University's Grievance Process

▆▆ The university argues that Stephens's claims are not properly before us because she failed to exhaust the remedies available to her under the *University of Minnesota Grievance Policy.* In support of this contention, the university relies on the doctrine of exhaustion of administrative remedies.

The applicability of the doctrine of exhaustion of administrative remedies to a dispute brought by a university employee involving a university decision is a matter of first impression for Minnesota appellate courts. This doctrine was discussed in the context of a different sort of dispute involving the university in *State ex rel. Sholes v. University of Minnesota,* 236 Minn. 452, 54 N.W.2d 122 (1952). In *Sholes,* the petitioner, as a citizen-taxpayer of Minnesota, sought a writ of mandamus to compel the board of regents to adopt and enforce rules and regulations prohibiting the use of university property or facilities for the teaching or dissemination of religious doctrine. 236 Minn. at 453, 54 N.W.2d at 124. The university argued that the writ of mandamus should be discharged because the petitioner had failed to exhaust administrative remedies within

5. Additionally, we question whether *any* Minnesota state court has jurisdiction to hear Stephens's claim that the university violated title 11. *See* 28 U.S.C. § 1334(a) (1994) (providing that, except as provided in 28 U.S.C. § 1334(b), federal district courts have "original and exclusive jurisdiction of all cases under title 11"); *id.* at § 1334(b) (providing that federal district courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11"); *Celotex Corp. v. Edwards,* 514 U.S. 300, 307, 115 S.Ct. 1493, 1498–99, 131 L.Ed.2d 403 (1995) (construing "not exclusive" language of section 1334(b) to refer to bankruptcy court jurisdiction under 28 U.S.C. § 157).

the university. *Id.* at 455, 54 N.W.2d at 125.

The supreme court declined to extend the doctrine of exhaustion of administrative remedies to disputes brought by a citizen-taxpayer. The court noted that even if it were to assume that the board of regents "could be considered to occupy a position analogous to an administrative agency in the application of this doctrine, there has been no action taken." *Id.* at 457, 54 N.W.2d at 126. This rendered the doctrine inapplicable because the doctrine "usually presupposes that some action has been taken by the administrative agency." *Id.* The court also noted that the University of Minnesota is not an administrative agency. *See id.* at 456–57, 54 N.W.2d at 126. Rather, the board of regents is

> a body corporate, created by our constitution and endowed by it with the power to govern the institution which it controls, free from interference by either [the] legislature or the courts so long as it stays within the scope of its constitutional powers.

*Id.* at 456, 54 N.W.2d at 126.

The supreme court instead turned to "a doctrine common to the law of corporations." *Id.* at 458, 54 N.W.2d at 127. The court first noted that the

> people were the "[in]corporators of this institution of learning" and "by their Constitution, conferred the entire control and management of its affairs and property" upon the board of regents.

*Id.* (quoting *State ex rel., University of Minnesota v. Chase*, 175 Minn. 259, 268, 220 N.W. 951, 955 (1928)). The *Sholes* court likened the petitioner to a corporate shareholder and found "applicable by analogy and controlling here" the doctrine that a shareholder "cannot maintain suit against the corporation to redress a corporate wrong until he has done all in his power to obtain within such corporation redress for the wrong complained of." *Id.* at 458, 460, 54 N.W.2d at 127–28 (quotation omitted). The supreme court held that "[i]t is only a matter of fairness and a

requirement of orderly procedure that a citizen be required to seek relief from the board of regents before proceeding in court." *Id.* at 461–62, 54 N.W.2d at 129. Thus, while the court found that the doctrine of exhaustion of administrative remedies was not applicable, the court, in effect, applied the substance of the doctrine—that a party seeking judicial relief from a decision of an administrative body must have first exhausted her right to seek relief within that body. *See generally City of Richfield v. Local No. 1215, Int'l Ass'n of Fire Fighters*, 276 N.W.2d 42, 51 (Minn. 1979) (defining doctrine of exhaustion of administrative remedies).

In determining whether Stephens must exhaust the remedies available to her under the *University of Minnesota Grievance Policy* before she may seek review of the university's decisions by writ of certiorari, we too must be mindful of the unique grant of authority given to the university by our state's constitution. The University of Minnesota was incorporated by Terr. L.1851, c. 3. Upon the grant of statehood to Minnesota, the people of the state

> by their constitution chose to perpetuate the government of the university which had been created by their territorial legislature in a board of regents, and the powers they gave are not subject to legislative or executive control.

*Fanning v. University of Minnesota*, 183 Minn. 222, 225, 236 N.W. 217, 219 (1931); *see* Minn. Const. art. XIII, § 3. Thus, the university is "a unique constitutional corporation." *Winberg v. University of Minnesota*, 499 N.W.2d 799, 801 (Minn. 1993). And the board of regents is "a 'body corporate' with [the] power to *govern.*" *Chase*, 175 Minn. at 265, 220 N.W. at 953; *State ex rel. Peterson v. Quinlivan*, 198 Minn. 65, 67, 268 N.W. 858, 860 (1936) (stating that the board of regents has the "duty to enact laws for the government of the [u]niversity" (quoting Terr. L.1851, c. 3, § 9)). University rules governing employee grievances are enacted

pursuant to this constitutional grant of authority. *Chronopoulos v. University of Minnesota,* 520 N.W.2d 437, 441 (Minn. App.1994), *review denied* (Minn. Oct. 27, 1994); *see Winberg,* 499 N.W.2d at 803 n. 3 (stating that "the internal management of the [u]niversity has been constitutionally placed in the hands of the regents alone"). And this court may not interfere with the board of regents "in the proper exercise of their function in governing the [university's] affairs." *Bailey v. University of Minnesota,* 290 Minn. 359, 360, 187 N.W.2d 702, 704 (1971); *see Sholes,* 236 Minn. at 456, 54 N.W.2d at 126 (stating that the board of regents is endowed by the Minnesota constitution with the power to govern the university "free from interference by [the] legislature or the courts").

Given the constitutional authority of the university, and the fact that university rules governing employee grievances are enacted pursuant to this authority, we find analogous two circumstances that require the exhaustion of internal processes before seeking redress in the courts.

First, we find similar to Stephens's employment relationship with the university the relationship between unionized employees and their employers. As a general rule, unionized employees cannot seek redress in the courts for an employer's claimed violation of an employee's rights under a collective-bargaining agreement ("CBA") without first exhausting the grievance process that the CBA provides. *Rowan v. K.W. McKee, Inc.,* 262 Minn. 366, 375–76, 114 N.W.2d 692, 697–98 (1962). The premise underlying this rule is that if an employee is allowed to seek redress in the courts before exhausting the grievance process provided in a CBA, the "collective bargaining agreement is effectively undermined." *Schuyler v. Metropolitan Transit Comm'n,* 374 N.W.2d 453, 455 (Minn.App.1985). Likewise, were we to allow a university employee to seek redress in this court before she has exhausted the grievance process applicable to her position, we would effectively under-

mine the rules, and thus the constitutional authority, of the university. *Cf. McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969) (stating that allowing party to circumvent internal agency remedies could weaken authority of agency).

Second, while the supreme court in *Sholes* determined that it is not precisely applicable, we find analogous the doctrine of exhaustion of administrative remedies, which the university urges us to apply. This doctrine is a development of federal administrative law and has been adopted in Minnesota regarding state court review of state administrative decisions. *International Ass'n of Fire Fighters,* 276 N.W.2d at 51; *Sholes,* 236 Minn. at 457, 54 N.W.2d at 126. Under this doctrine, "[i]t is fundamental that before judicial review of administrative proceedings will be permitted, the appropriate channels of administrative appeal must be followed." *International Ass'n of Fire Fighters,* 276 N.W.2d at 51. Exhaustion is required because it serves two important purposes—protecting the autonomy of administrative agencies and promoting judicial efficiency. *See McCarthy v. Madigan,* 503 U.S. 140, 145, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992). Both of these purposes would be served by applying the substance of the doctrine here.

In the federal context, the autonomy due to an administrative agency is grounded in deference to Congress's delegation of authority to coordinate branches of the federal government. *See id.* Because an administrative agency is invested by Congress with certain powers and duties, courts should not ordinarily interfere with an agency's execution of its powers until its internal-review processes are exhausted or unless it has clearly exceeded its jurisdiction. *See McKart,* 395 U.S. at 196, 89 S.Ct. at 1663. This deference reflects recognition that an agency must have the opportunity to correct its own errors "before it is haled into federal court." *McCarthy,* 503 U.S. at 145, 112 S.Ct. at

1086. Additionally, allowing a party to circumvent administrative processes could weaken the authority of an agency "by encouraging people to ignore its procedures." *McKart*, 395 U.S. at 195, 89 S.Ct. at 1663.

The University of Minnesota, however, is not a mere administrative agency—it is much more than that. *See Winberg*, 499 N.W.2d at 801; *Sholes*, 236 Minn. at 456, 54 N.W.2d at 126. The university's powers and duties are invested by our state's constitution. *E.g., Winberg*, 499 N.W.2d at 801. Thus, the deference owed by courts to administrative agencies as required by the doctrine of exhaustion of administrative remedies is at least as important here because of the deference owed by this court to the university in executing its constitutional powers and duties. And because "the internal management of the [u]niversity has been constitutionally placed in the hands of the regents alone," *id.* at 803 n. 3, the university should also be allowed to correct its own errors through its internal processes before being haled into court. Additionally, allowing a university employee to circumvent the grievance process applicable to her position would encourage employees to ignore the university's grievance processes and thereby weaken the constitutional authority of the institution.

The interest in promoting judicial efficiency served by the doctrine of exhaustion of administrative remedies would also be served by applying the substance of the doctrine here. If the university is allowed to address its own alleged errors through its grievance processes, the need for parties to resort to judicial review may be mooted, or at least piecemeal appeals may be avoided. *See McCarthy*, 503 U.S. at 145, 112 S.Ct. at 1086–87. And if a dispute remains unresolved after review by the university through its grievance processes, exhaustion of those processes will likely produce a record that facilitates subsequent judicial review. *See id.* at 145–46, 112 S.Ct. at 1087; *see also University of*

*Minnesota Grievance Policy*, § IV(D) (requiring hearing panel to prepare decision consisting of statement of issues, contentions of parties, findings of fact, and opinion).

Thus, in summary, the following factors guide our decision here: (1) the supreme court's holding in *Sholes* requiring a citizen-taxpayer to seek redress from the board of regents before proceeding to court; (2) the deference owed by this court to the university because of its status under our state's constitution and the fact that the university enacted rules governing employee grievances pursuant to its constitutional authority; (3) the fact that to allow an employee to circumvent university grievance processes would weaken the university's constitutional authority; and (4) our determination that the interests of judicial efficiency would be furthered by requiring exhaustion of university grievance processes. We conclude, therefore, that an employee of the university who challenges a university decision adversely affecting her employment must exhaust the grievance process applicable to her position before she seeks review of the decision by writ of certiorari.

Stephens has failed to exhaust the applicable university grievance process. A party may challenge a university decision imposing discipline by filing a grievance with the university grievance office. *University of Minnesota Grievance Policy*, § II, IV(A). A grievance officer then arranges an informal "Phase I" meeting between the grievant and the party responsible for the decision challenged. *Id.* at § IV(B). If the grievant is not satisfied with the results of this meeting, the officer then arranges a "Phase II" meeting between the grievant and the supervisor of the person imposing discipline. *Id.* at § IV(C). If the grievant desires further review, the officer then arranges a "Phase III" hearing before a panel. *Id.* at § IV(D).

After Stephens filed her amended grievance on November 21, 1999, the grievance

officer contacted President Yudof, and a Phase I meeting was scheduled for December 15, 1999. But Stephens cancelled her meeting with President Yudof and, therefore, withdrew from the university's grievance process before exhausting it.

■ Although Stephens initially sought review of the university's decisions by filing a grievance, she now argues that the *University of Minnesota Grievance Policy* is not applicable to her former position with the university. In 1997, Stephens accepted a position as the university's "Associate Vice President for Finance and Operations and Treasurer." This "academic administrative" position is subject annually to "nonrenewal" and is governed by the university's *Academic Professional and Administrative Staff Policies and Procedures*.[6] An administrative staff member "may be disciplined for just cause" and may grieve imposition of discipline by filing a grievance with the university grievance officer. *Academic Professional and Administrative Staff Policies and Procedures*, § I(C)(7); *see University of Minnesota Grievance Policy*, § II(A) (providing that grievance policy is applicable to academic administrative employees). Thus, it is clear that the grievance process established by the *University of Minnesota Grievance Policy* is applicable to Stephens's former position with the university.

■ Stephens also argues that this court may review her claims despite her failure to exhaust the process established by the grievance policy because, she alleges, it would have been futile for her to do so. As a general rule, a party may seek judicial review before the party exhausts internal-remedy processes where exhaustion would be futile. *See, e.g., Rowan*, 262 Minn. at 375–76, 114 N.W.2d at 697–98 (holding that employee must exhaust

grievance procedures established in CBA unless employee can show that resort to those procedures would be futile); *International Ass'n of Fire Fighters*, 276 N.W.2d at 51 (stating that doctrine of exhaustion of administrative remedies "is not applicable where it would be futile to seek such redress"). *But see Sholes*, 236 Minn. at 461, 54 N.W.2d at 128 (finding when petitioner alleged "numerous acts of questionable legality * * * it will be time enough for the courts to intervene" after petitioner shows that board of regents "has been requested to act and has failed to take such corrective action as may be necessary"). Whether exhausting internal remedies would have been futile is a question of law for this court. *See Leaon v. Washington County*, 397 N.W.2d 867, 874 (Minn.1986).

Stephens argues that because any hearing panelist would be "directly or indirectly responsible" to President Yudof or the board of regents, no disinterested persons could be impaneled to hear her grievance. Thus, Stephens argues, exhausting the applicable university grievance process would have been futile. We disagree.

In *Ellingson & Assocs., Inc. v. Keefe*, 410 N.W.2d 857 (Minn.App.1987), the party seeking judicial review argued that exhaustion of administrative remedies would be futile because the workers' compensation rehabilitation review panel comprised the commissioner of labor and industry, who had previously ruled against the party, and his appointees. We found that resort to the panel would not be futile. *Ellingson*, 410 N.W.2d at 860. First, we noted that the panel was required to "fairly consider the merits of each allegation." *Id.* We then noted that the circumstances of *Ellingson* were no different from "countless imaginable cases preceded by decisions or statements of the [c]ommis-

---

**6.** According to Stephens's notice of appointment from the university, her position is given a class title of "9303." Under the university's *Academic Professional and Administrative Staff Policies and Procedures*, § I(B), all posi-

tions of a class title "93xx" are "academic administrative" positions and are subject to the *Academic Professional and Administrative Staff Policies and Procedures*.

sioner" or his department's staff. *Id.* Finally, we noted that "meaningful review" of the panel's decision would be available through both the workers' compensation court of appeals and the Minnesota Supreme Court. *Id.*

The members of a university Phase III grievance panel are even further removed from potential presidential influence than the panel discussed in *Ellingson* was removed from the influence of the commissioner. For example, the president does not sit on a Phase III panel. *University of Minnesota Grievance Policy,* § IV(D). Rather, such a panel comprises one member of the university grievance board chosen by the grievant, one designee of either the vice-president or the president, and one hearing officer, selected by the grievance officer, who is of the same employee category as the grievant. *Id.* And the grievance policy provides that "[n]o panelist shall have a direct interest in the grievance." *Id.* Additionally, if we were to conclude that Stephens's pursuit of a grievance would have been futile, we would in effect be concluding that the pursuit of any grievance arguably involving a decision of the university's president would be futile, a conclusion we are unwilling to reach. Finally, if Stephens had exhausted the grievance process and was dissatisfied with the result, she would still have had judicial review available to her. We therefore conclude as a matter of law that it would not have been futile for Stephens to have exhausted the university's grievance process.

Thus, because Stephens failed to exhaust the grievance process applicable to her position with the university, and because exhaustion of that process would not

have been futile, we discharge the writ of certiorari issued in response to her December 13, 1999, petition. Stephens's claims that the university breached her contract and that the decisions challenged here were arbitrary, capricious, and made in violation of the university's policies are, therefore, not properly before us.[7]

■ The University of Minnesota is clearly not "above the law." *Fanning,* 183 Minn. at 226, 236 N.W. at 219. When a party has exhausted the remedies available to her at the university, we will reverse the university's decision if it is arbitrary, oppressive, unreasonable, fraudulent, reached under an erroneous theory of law, or without any evidence to support it. *See, e.g., Ganguli,* 512 N.W.2d at 921–23. But Stephens has purposefully circumvented the university's processes by withdrawing her grievance and instead asking this court to intervene by writ of certiorari. The supreme court has repeatedly warned of preemptive judicial intervention in the university's execution of its constitutionally vested powers, and we decline to intervene in such a manner here.[8]

## DECISION

We grant, in part, Stephens's request to strike portions of the record submitted by the university. We deny Stephens's request to supplement the record. Additionally, we grant, in part, the university's request to strike portions of Stephens's appendix.

Stephens cannot pursue by writ of certiorari her claim that the university discriminated against her, in violation of 11

7. Because Stephens's challenge to the university's decisions is not properly before us, we need not address her contentions that portions of the record must be suppressed under 18 U.S.C. §§ 2511, 2515 (1994), and the Fourth Amendment.

8. Because Stephens failed to exhaust any phase of the university's grievance process,

we do not address whether a party would be precluded from seeking judicial review before exhausting "Phase IV" arbitration in which a grievant agrees to binding arbitration and purportedly "waive[s] and release[s] all rights to pursue substantially the same claim in any other forum." *University of Minnesota Grievance Policy,* § IV(D).

U.S.C. § 525 (1994), because she filed for bankruptcy. And because Stephens failed to exhaust the university's grievance process applicable to her position with the university, and because exhaustion of that process would not have been futile, we discharge the writ of certiorari issued in response to Stephens's December 13, 1999, petition.

**Writ of certiorari discharged.**